

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

JUL 3 | 2000

| | | |
|---|---|---|
| MARY DEWS, | § | |
| *Plaintiff,* | §<br>§<br>§ | |
| HAMMER-SMITH CONSTRUCTION CO., INC., | §<br>§ | CA 3:88-CV-1604-R |
| *Plaintiff-Intervenor,* | §<br>§<br>§ | |
| THE WALKER PROJECT, INC., | §<br>§ | |
| *Plaintiff-Intervenor,* | §<br>§ | |
| vs. | §<br>§ | |
| THE TOWN OF SUNNYVALE, TEXAS, | §<br>§ | |
| *Defendant.* | §<br>§ | |



ENTERED ON DOCKET

AUG · i 2000

U.S. DISTRICT CLERK'S OFFICE

## <u>MEMORANDUM OPINION</u>

Approximately twelve miles east of the central business district of Dallas lies the aptly-named town of Sunnyvale. Nestled in the midst of towns defined by the shopping malls and dense apartment development for which the Dallas Metropolitan Area has become famous, Sunnyvale presents a stark contrast. It is a beautiful, rural, Texas town with almost 11,000 acres of rolling hills and green grassland and only 2,000 residents. Sunnyvale has no shopping malls and no apartment developments. The secret to Sunnyvale's success is its unusual zoning laws, including an outright ban on apartments and a one-acre zoning requirement for residential development. It is these zoning laws, allegedly enacted by the residents of Sunnyvale to preserve their rural lifestyle, which are being challenged by Plaintiffs on the grounds that they were

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 1**

144

enacted with the intent of excluding minority families from living in Sunnyvale and with the effect of prohibiting the development of multi-family housing within Sunnyvale's town limits, an effect which falls disproportionately on African-Americans looking for housing in the Dallas Metropolitan Area.  Plaintiffs also challenge the Town's refusal to approve the planned development application submitted by Plaintiff Hammersmith Construction Co., Inc.

Plaintiff-Intervenors Walker Project, Inc. and Hammer-Smith Construction Co., Inc. ("Plaintiffs") allege that Defendant Town of Sunnyvale ("Sunnyvale") has engaged in racially discriminatory zoning and planning practices in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601 *et seq.*; the Civil Rights Act of 1866, as amended, 42 U.S.C. §§ 1981, 1982; the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983, and the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d.[1]  Plaintiffs also allege that Sunnyvale's ongoing zoning and planning practices inhibit and obstruct the desegregation of Dallas's low-income housing programs, as ordered by this Court in the consent decree[2] approved on January 20, 1987 in *Walker v. HUD*, CA 3-85-1210-R (N.D.Tex., J. Buchmeyer).  Plaintiffs seek injunctive and declaratory relief, costs, and attorneys' fees.

The Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 3613.  This case came before the Court for a four-day bench trial beginning on October

---

[1]The original plaintiff in this case, Mary Dews, passed away in December of 1991. Plaintiff-Intervenor Hammer-Smith Construction Co. had been permitted to enter the case in 1989, and Plaintiff-Intervenor The Walker Project, Inc. was granted permission to intervene on May 19, 1994.  To simplify the writing and reading of this decision, the Court will refer to the Plaintiff-Intervenors jointly as "the Plaintiffs."

[2]The full text of the consent decree is published at *Walker v. HUD,* 734 F. Supp. 1231, 1247 (N.D. Tex. 1989) ("Walker I").

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 2**

20, 1997.  Having considered the evidence and argument submitted at trial and the written

submissions of the parties, the Court concludes that Sunnyvale's actions in maintaining a one-

acre zoning ordinance, in enacting a resolution banning apartments, and in refusing to consider

the rezoning application of Hammer-Smith Construction Co., Inc., have a discriminatory effect

on African-Americans *and* are motivated by a discriminatory purpose, all in violation of 42

U.S.C. §§ 1981, 1982, 1983, 2000d, and 3604.

This opinion will first discuss the applicable law governing race discrimination claims

based on zoning and planning decisions.  Next, it will state this Court's findings regarding the

credibility of the witnesses who testified at the four-day, non-jury trial.  Then, it will state this

Court's findings of fact, which will essentially be a history of zoning and planning decisions in

the Town of Sunnyvale.  Finally, the opinion will close with this Court's conclusions of law and

choice of remedies.

## I.      THE LAW APPLICABLE TO HOUSING DISCRIMINATION CLAIMS

Plaintiffs have asserted claims under both the Fair Housing Act of 1968, as amended, 42

U.S.C. § 3601 *et seq.*, and various Civil Rights Acts, as amended, 42 U.S.C. §§ 1981, 1982,

1983, and 2000d.  The standards required to prove liability under these statutes differ.

The Fair Housing Act expressly prohibits discrimination in the rental or sale of a dwelling

on the basis of race, color, religion, sex, familial status, or national origin.  *See* 42 U.S.C.

§3604(a).  The Act has been interpreted to prohibit municipalities from using their zoning

powers in a discriminatory manner, that is in a manner which excludes housing for a group of

people on the basis of one of the enumerated classifications.  *See Huntington Branch, NAACP v.*

*Town of Huntington,* 844 F.2d 926 (2d Cir.), *aff'd* 488 U.S. 15 (1988); *United States v. City of*

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 3**

*Black Jack,* 372 F. Supp 319, 327 (E.D. Mo.), *rev'd on other grounds,* 508 F.2d 1179 (8th Cir.

1974), *cert. denied,* 422 U.S. 1042 (1975).  The Fifth Circuit has established that plaintiffs suing

under the Fair Housing Act may establish liability by showing intentional discrimination *or* by

showing that the defendant's acts have a significant discriminatory effect.[3]  *See Simms v. First*

*Gibraltar Bank,* 83 F.3d 1546, 1555 (5th Cir. 1996) ("a violation of the FHA may be established

not only be proof of discriminatory intent, but also by a showing of significant discriminatory

effect"); *Hanson v. Veterans Admin.,* 800 F.2d 1381, 1386 (5th Cir. 1986) ("a violation of section

804 of the Fair Housing Act may be established not only by proof of discriminatory intent, but

also by a showing of a significant discriminatory effect."); *United States v. Mitchell,* 580 F.2d

789, 791 (1978) ("[t]he Fair Housing Act prohibits not only direct discrimination but practices

with racially discouraging effects").

    In contrast, plaintiffs suing under Sections 1981, 1982, 1983 and 2000d are required to

prove discriminatory intent.  *See Coleman v. Houston Indep. Sch. Dist.,* 113 F.3d 528, 533 (5th

---

[3]Indeed, the majority of Circuit courts to have ruled on this issue have recognized Fair
Housing Act claims established by a showing of discriminatory effect.  *See United States v.*
*Yonkers Bod. Of Educ.,* 837 F.2d 1181, 1217 (2d Cir. 1987), *cert. denied,* 486 U.S. 1055 (1988)
("the consensus is that a plaintiff need prove only discriminatory effect, and need not show that
the decision complained of was made with discriminatory intent"); *Huntington* at 934 ([t]he
Act's stated purpose to end discrimination requires a discriminatory effect standard");
*Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 448 F.2d 1283, 1287-
90 (7th Cir. 1977) (holding that Fair Housing Act claim could be established by proof of
discriminatory effect, without proof of discriminatory intent); *United States v. Cit of Black Jack,*
508 F.2d 1179, 1184-85 (8th Cir. 1974), *cert. denied,* 422 U.S. 1042 (1975) ("[t]he burden of
proof in Title VIII cases is governed by the concept of the 'prima facie case.' ... To establish a
prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct
of the defendant actually or predictably results in racial discrimination; in other words, that it has
a discriminatory effect."); *Resident Advisory Board v. Rizzo,* 564 F.2d 126, 146-48 (3d Cir.
1977), *cert. denied,* 435 U.S. 908 (1978) ("[w]e conclude that, in Title VIII cases, by analogy to
Title VII cases, unrebutted proof of discriminatory effect alone may justify a federal equitable
response").

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 4**

Cir. 1997) (plaintiff must demonstrate intentional discrimination for racial discrimination claims

brought under §1983 and §1981); *Hanson,* 800 F.2d at 1386 (5th Cir. 1986) (proof of

discriminatory intent required for §1981 and §1982 claims); *Guardians Ass'n v. Civil Serv.*

*Comm'n of New York City,* 463 U.S. 582, 611 (1982) (recovery under § 2000d requires showing

of discriminatory intent). Section 1981 prohibits race discrimination in the making and

enforcement of contracts. *See* 42 U.S.C. §1981. Section 1982 prohibits race discrimination in

the inheritance, purchase, sale, holding and conveyance of real and personal property. *See* 42

U.S.C. §1982. Section 1983 prohibits state officials from depriving individuals of rights,

privileges, or immunities secured by the Constitution and federal law. *See* 42 U.S.C. §1983.

And Section 2000d prohibits discrimination on the basis of race, color or national origin against

beneficiaries of federally funded programs. *See* 42 U.S.C. §2000d.

A.    **Discriminatory Effect**

Discriminatory effect may be proven by showing either (1) "adverse impact on a

particular minority group" or (2) "harm to the community generally by the perpetuation of

segregation." *Huntington Branch NAACP v. Town of Huntington,* 844 F.2d 926, 937 (2nd Cir.),

*aff'd,* 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed.2d 180 (1988); *see also, Summerchase Ltd.*

*Partnership I v. City of Gonzales,* 970 F. Supp. 522, 527-28 (M.D.La. 1997). The Second

Circuit's decision in *Huntington* is directly on point and has been accepted as the leading opinion

on Fair Housing Act challenges to zoning ordinances.[4] *See* 1 RODNEY A. SMOLLA, FEDERAL

CIVIL RIGHTS ACTS §3.07[4] (3rd ed. 1997) ("In *Huntington Branch, NAACP v. Town of*

---

[4]The Second Circuit's disparate impact test is based on both the Seventh Circuit's four-part test in *Arlington Heights II* and the Third Circuit's test in *Rizzo. See Huntington* at 935-36.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 5**

*Huntington,* the Second Circuit, in an opinion later affirmed *per curiam* by the Supreme Court,

issued the most important zoning practice decision to date under the Fair Housing Act.").

In *Huntington*, the Town of Huntington had enacted a zoning ordinance which restricted

private construction of multi-family housing to a narrow urban renewal area and had also refused

a non-profit developer's request to rezone a parcel of land located outside the urban renewal area,

on which they wished to develop an integrated, multi-family, subsidized apartment complex.

The Town argued that the ordinance was designed to encourage private developers to build in the

deteriorated, urban renewal area.  Plaintiffs challenged both the zoning ordinance itself and the

Town's refusal to rezone the particular parcel of land. *See Huntington,* 844 F.2d at 938 (2nd Cir.).

The Second Circuit found that the Town's zoning ordinance had both a "segregative"

effect" and an adverse impact on African Americans. *See Huntington* at 937-38.  In concluding

that the zoning ordinance tended to perpetuate segregation, the Court pointed out that

"Huntington's zoning ordinance, which restricts private construction of multi-family housing to

the largely minority urban renewal area, impedes integration by restricting low-income housing

needed by minorities to an area already 52% minority." *Id.*  In its adverse impact analysis, the

Court relied on the following figures contained in Huntington's Housing Assistance Plan[5] for

1982-1985:

> 7% of all Huntington families needed subsidized housing, while 24 % of the black
> families needed such housing. ... Similarly, a disproportionately high percentage
> (60%) of families holding Section 8 certificates from the Housing Authority to
> supplement their rents are minorities, and an equally disproportionate percentage
> (61%) of those on the waiting list for such certificates are minorities.

---

[5]The Town's Housing Assistance Plan (HAP) was adopted by the Town Board and filed
with the U.S. Department of Housing and Urban Development (HUD) as part of the Town's
application for federal community development funds.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 6**

*Huntington* at 938; *see also, United States v. Mitchell,* 580 F.2d 789, 791 (5th Cir. 1978) ("[t]he fact that a large majority of Mitchell's black tenants were clustered in a defined area is highly probative of a §3604(a) violation.  Statistics, although not dispositive, 'have critical, if not decisive significance.' ... The district court's decision, based on statistical evidence and evidence of actions that effectively confined blacks to a section of the complex, is therefore consistent with the requirements of §3604(a).") (internal citations omitted).

Once the plaintiff has made out a prima facie case of discriminatory effect, by demonstrating adverse impact on a particular minority group and harm to the community generally by the perpetuation of segregation, the burden shifts to the defendant to prove a compelling government interest.  Specifically, a defendant must show that (1) its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest, and (2) no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact. *See Huntington* at 939 (relying on *Rizzo* at 149).  In *Huntington*, the Town argued that limiting multi-family development to the urban renewal area would encourage private developers to build in this area and thereby help to revitalize it.  However, the Second Circuit found that less discriminatory methods, such as tax benefits, could be used to encourage private development in the area and that these more direct incentives were more likely to be effective. *See Huntington* at 939.  In defending its decision not to rezone the particular piece of land outside the urban renewal area, the Town listed seven justifications; the Court found these justifications to be "weak and inadequate." *Id.* at 940.

Finally, in balancing the Plaintiff's showing of discriminatory effect against the Town's asserted justifications, the Court noted that the scale should be tipped in the plaintiff's favor

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 7**

when it is seeking to enjoin interference with its own development plans rather than to compel

the municipality to build the housing itself. *See id.* at 940 (citing to the Seventh Circuit's

decision in *Arlington Heights II*).

### B.    Discriminatory Intent

The  Fifth Circuit's test for finding discriminatory intent in violation of the Fair Housing

Act requires plaintiffs to establish (1) a fact issue as to whether the defendant's stated reasons for

its decision are pretextual and (2) a reasonable inference that race was a significant factor in the

refusal. *See Simms v. First Gibraltar Bank,* 83 F.3d 1546, 1556 (5th Cir.), *cert. denied,* 519 U.S.

1041, 117 S. Ct. 610, 136 L. Ed.2d 535 (1996) (analogizing to the discriminatory intent test for

claims brought under the Age Discrimination in Employment Act).  In *Simms,* the evidence at

trial established that the plaintiff had submitted a qualified proposal seeking a commitment letter

from the defendant bank for the refinancing of an existing loan on property located in a

predominantly minority area. *Id.* at 1557.  The Fifth Circuit agreed that the evidence had created

a fact issue as to whether the defendant's stated reasons for refusing to issue a commitment letter

were what actually motivated the bank.  However, it found that a reasonable jury could *not* find

that race was a significant factor in the defendant's refusal. *Id.* at 1557-58.

The Supreme Court has established a slightly different test for measuring discriminatory

intent in violation of the Equal Protection Clause. *See Arlington Heights v. Metro. Housing*

*Corp.,* 429 U.S. 252, 97 S. Ct. 555, 50 L. Ed.2d 450 (1977); *see also, United Farm. Of Fla. H.*

*Proj., Inc. v. City of Delray Beach,* 493 F.2d 799, 811 (5th Cir. 1974)("In light of ... the changes

in City Planner Smoot's designation for the use of the area without explanation; the conflict

between the City's Master Plan designation and the county's long-held and recently reviewed

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 8**

zoning designation for the subject property; ... the desperate need for low income housing for farmworkers; and the concentration of almost all low income housing in a segregated area, we are convinced that the City failed to meet its burden of proving that its refusal was necessary to promote a compelling governmental interest, and thus that the city officials have deprived the farmworkers of equal protection of the law under the fourteenth amendment.").

In *Arlington Heights,* a non-profit development corporation brought suit under the Fourteenth Amendment and the Fair Housing Act, based on the Village's denial of its request for rezoning from single-family to multiple-family, in order to build a racially integrated, low and moderate income housing project. *See Arlington Heights v. Metro. Housing Corp.,* 429 U.S. at 254, 50 L. Ed.2d at 457 (1977). While the Supreme Court refused to consider the plaintiff's Fair Housing Act claim, on the grounds that the Seventh Circuit's opinion had not reached this claim, it did establish a multi-factorial test for proving discriminatory intent under the Equal Protection Clause. In the absence of direct evidence of discriminatory purpose, courts may consider the following: (1) discriminatory impact; (2) the historical background of the challenged decision; (3) the specific sequence of events leading up to the decision; (4) any procedural and substantive departures from the norm; and (5) the legislative or administrative history of the decision. *See id.* Once a plaintiff has introduced sufficient evidence to establish discriminatory intent, the burden of proof shifts to the defendant to establish that the same decision would have resulted even had the impermissible purpose not been considered. *See id.* at 271, n. 21.

## II.    THE CREDIBILITY OF THE WITNESSES

These are the Court's credibility determinations concerning the principal witnesses who testified at the four-day, non-jury trial. These determinations are based upon standard credibility

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 9**

factors, including the manner in which each witness testified, any inconsistencies in the

testimony, whether the witness was impeached or confused, and whether the witness had some

reason not to be truthful.

### A.    Plaintiffs' Witnesses

1. **James L. Northrup** testified about a business partnership he entered into with the

Mayhew family in the mid-1980's for the purpose of submitting a planned development

application[6] to the town of Sunnyvale.  In the course of assembling the necessary land for the

Mayhew Ranch Planned Development application, Northrup met with a man named Robert

Williams who was a member of the Sunnyvale Town Council and who managed a piece of

property adjoining the Mayhew's property.  Northrup testified about a conversation he had with

Williams on or about November 29, 1985 during which Williams said that he supported one-acre

zoning because it kept "niggers" out of Sunnyvale.  Northrup's testimony concerning his

conversation with Williams is admitted, not for its truth, but to show Northrup's state of mind at

the time of the conversation.  *See* FED. R. EVID. 803.  The Court credits Northrup's testimony.

2. **Craig Gardner**, executive director of The Walker Project, Inc. ("WPI") since 1991,

testified about a meeting held in 1992 between Gardner, then Sunnyvale Mayor Paul Cash, and

Sunnyvale's planning consultant, Dr. Robert Freilich, to discuss administrative complaints

brought against Sunnyvale.  Earlier in 1992, Gardner and the WPI had filed housing

discrimination complaints with the U.S. Department of Housing and Urban Development

---

[6]A planned development application differs from a typical request for a zoning variance
in that the ultimate density, type, and location of particular uses in the planned development are
the result of compromises reached between the developer and the town.  The application
submitted by Northrup and Mayhew was for the Mayhew Ranch Planned Development.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 10**

("HUD") against over 30 cities in Dallas County, including the Town of Sunnyvale. The complaints, which are still pending, accuse the towns of refusing to enter into cooperation agreements with the Dallas Housing Authority ("DHA") – agreements which would enable DHA to build affordable housing within their municipal boundaries. Gardner testified that WPI's position is that each of the cities against which complaints were filed has housing and/or zoning practices which discriminate against racial minorities and impede the development of multifamily and other affordable housing within its boundaries. In an effort to negotiate a settlement, Freilich and Cash drafted a conciliation agreement which called for the construction of one to two units of affordable housing in Sunnyvale! This purported conciliation agreement was presented to Gardner during the 1992 meeting. Not surprisingly, Gardner recommended that WPI's Board of Directors vote down Freilich's proposal, which they did. The Court found Gardner's testimony to be credible.

3. **Reginald Douglas Smith** is the president and general manager of Hammer-Smith Construction Co. ("Hammer-Smith"), a real-estate development company and a Plaintiff-Intervenor in this case. Smith, who is African American, and Hammer, who is white, started Hammer-Smith around 1984. In the summer of 1988, Hammer-Smith submitted a planned development application to the Town of Sunnyvale seeking zoning changes for the construction of affordable single and multi-family housing.

Smith testified that the first time he had discussions with anyone concerning the development of property in Sunnyvale was in June 1988, when he received a phone call from James Northrup, whom he had known since the mid-1970's and whom he knew to be affiliated with the unsuccessful Mayhew Ranch Planned Development ("MRPD") application. Northrup

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 11**

proposed that Hammer-Smith and Northrup's company enter into a partnership for the purchase

of approximately 342 acres of the Mayhew tract – land which had previously been designated in

the MRPD application as suitable for multi-family and single-family cottage lots.  Hammer-

Smith agreed and submitted its application for planned development approval to the Town of

Sunnyvale in July 1988, accompanied by the impact studies provided to the town in the

unsuccessful MRPD application.

Although the Town initially told Smith that the Hammer-Smith application was complete,

it subsequently tabled the application and demanded  that Hammer-Smith pay the Town $22,800

for further impact studies, even though the land which comprised Hammer-Smith's planned

development had already been extensively analyzed by the Town's engineer and other consulting

engineers as part of the earlier MRPD application.

The Hammer-Smith application was accompanied by a letter dated June 11, 1988 from

Smith to Sunnyvale Town Manager Robert Ewalt, which specifically identified Hammer-Smith

as a minority-owned business and a builder of Section 8 housing.  Had its application been

approved, Hammer-Smith intended to begin developing the multifamily and single-family

housing immediately, which would have resulted in the completion of the multifamily units in

1995 and the single-family units in 1998.

The Court found Smith's testimony to be credible, forthright and direct.

**B.    Defendant's Witnesses**

1. **Robert Ewalt**, who has resided in Sunnyvale since March 1979 and has served as

Town Administrator since December 1983, testified about his personal knowledge of the

municipal operations of the Town, including the Town's physical facilities and municipal

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 12**

services.  Ewalt also expressed personal knowledge regarding the extent to which social,

recreational, educational, commercial and health facilities services were present in Sunnyvale.  In

addition, Ewalt described current development activities and conditions in Sunnyvale, the

historical and current availability of sanitary sewer service in Sunnyvale, and the historical

background regarding the MRPD Application and the Hammer-Smith Application.

As Town Administrator, Ewalt is responsible for reviewing development applications for

completeness.  Contrary to Defendant Sunnyvale's assertion, Ewalt testified that Hammer-

Smith's proposed development application was complete when he received it.  The Court credits

Ewalt's trial testimony.

2. **Dr. Robert H. Freilich** testified as an expert witness for the Defendant.  Freilich, the

founding partner of a planning and law firm in Kansas City named Freilich, Leitner & Carlisle,

was initially retained by the Town of Sunnyvale back in 1991 when he served as lead appellate

counsel for Sunnyvale in its *Mayhew* state court litigation.  *See Mayhew v. Town of Sunnyvale*,

905 S.W.2d 234 (Tex. App. — Dallas 1994), *rev'd*, 964 S.W.2d 922 (Tex. 1998) (hereinafter

"*Mayhew*"); *see also,* discussion, *supra,* n. 10.  Freilich has been retained by Sunnyvale in two

additional matters:  the attempted resolution of the 1992 HUD complaint filed against Sunnyvale

by WPI, and the drafting of the Town's 1993 planning and zoning legislation and accompanying

development regulations.

As a result of his previous work for Sunnyvale, Freilich has become familiar with the

Town's historical and existing zoning legislation and regulations, including the various

comprehensive plans and zoning ordinances adopted by the Town since its incorporation in 1953;

the MRPD Application and Executive Summary Report, with the supporting impact studies; the

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 13**

related *Mayhew* pleadings and minutes of the public meetings concerning the events giving rise to that litigation; and census and statistical data from the North Central Texas Council of Governments in Dallas County, including the 1980 and 1990 censuses and the 1980 and 1991 Dallas County Open Space Plans. He has also reviewed certain pleadings and written discovery, including depositions and deposition exhibits pertaining to this action; the Hammer-Smith Planned Development Application and related correspondence; minutes reflecting appearances by Hammer-Smith representatives in 1988 before the Town Council and the Town's Planning and Zoning Committee (P&Z), and the transcript of those same proceedings; and the numerous documents and statutory provisions referenced or cited in his written report.

Freilich was retained in the instant litigation to review a number of issues relating to whether the Town's planning and zoning history, and related application and development approvals, have had a discriminatory effect on African-Americans. He was also asked to examine the various policies the Town has enacted from its incorporation in 1953 through the 1993 Comprehensive Plan and Zoning Ordinance, in order to establish what considerations were significant in developing the overall goals, objectives, strategies and policies pertaining to land use and development applications. In addition, he was asked to review the Town's consideration of the Mayhew-Ranch and Hammer-Smith Planned Development applications, with due consideration given to the Fair Housing Act, and to determine the substantive rationale behind actions taken related to those projects. Finally, he was asked to determine whether the Town's planning and zoning regulations complied with the Town's regional fair share of population and affordable housing, and other critical governmental goals, objectives and policies.

At trial, Plaintiff's attorney Michael Daniel objected to Freilich as a biased expert witness

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 14**

due to his ethical duty to zealously represent Sunnyvale in zoning matters based on his continuing representation of the Town in the then pending *Mayhew* litigation. While the Court allowed Freilich to testify as an expert witness, it found Freilich's testimony to lack credibility. His past and ongoing representation of the Town make him both too intimately involved with the subject matter of this litigation and too steeped in bias to be an objective witness.

3. **Dr. Dowell Myers** testified as the Defendant's second expert witness. There were no objections to Myers' testimony, and the Court found it to be credible. Myers was retained by Sunnyvale (a) to develop a fair share of regional housing methodology and model that could be applied to Sunnyvale; (b) to review the development history and growth patterns in Sunnyvale to determine its historical and projected growth; (c) to review certain minutes of Sunnyvale to determine the types of issues that were being discussed with regard to growth management topics, and to determine whether those comments and topics indicated or reflected racial prejudice; and (d) to review the relevance, accuracy and proper interpretation and analysis of statistical data presented to the court by Plaintiffs from the American Housing Surveys and United States Census.

Myers obtained a Bachelor of Arts degree in anthropology from Columbia University in 1972, a Masters Degree in city planning in city and regional planning from the University of California at Berkeley in 1975, and a doctorate degree in urban and regional planning from the Massachusetts Institute of Technology in 1981. Since 1988, Myers has taught a number of courses that specialize in housing, urban demography and planning. Myers' expertise includes "housing and also the characteristics of the population that lives in houses," "population migration, population growth, urban growth, [and] real estate . . . ." Myers has served or is

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 15**

currently serving as an expert witness in seven cases involving housing demography issues, including (a) reporting on patterns of housing market demand and housing prices in the City of Longview, Texas; (b) reporting on growth patterns in Dallas County and the occupancy of apartment housing by different racial groups for the City of Coppell, Texas; (c) preparing a demographic analysis of the racial composition of the City of Desert Hot Springs, California, and in a proposed residential development; and (d) preparing an analysis of housing affordability in the City of Oceanside, California, including growth trends, and quality of life trends. Myers has worked with United States Census data for 25 years. He also authored a text book entitled *Analysis with Local Census Data: Portraits of Change*, published in 1992.

4. **Paul Cash**, who served as Mayor of Sunnyvale from May 1989 to May 1993, testified about his personal knowledge of Sunnyvale's correspondence and communications with both the Dallas Housing Authority ("DHA") and the U.S. Department of Housing and Urban Development. Cash testified that Sunnyvale received a letter dated January 28, 1991 from then Dallas Mayor Annette Strauss requesting that it enter into a cooperation agreement with DHA for the development of a reasonable number of assisted housing units within Sunnyvale's city limits for persons eligible for public housing. Cash testified that he responded to Mayor Strauss by a letter dated February 4, 1991, stating, among other matters, the following:

> The City of Sunnyvale will not oppose any low income family housing within its city limits, assuming that the same is accomplished with consideration to the environment and the open life style that the citizens of Sunnyvale have selected for themselves. We encourage all ethnic groups and all persons to join with us in our suburban setting and to adopt the life style that our citizens have selected for themselves.[7]

---

[7]Def.'s Ex. 190 - Cash's February 4, 1991 letter.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 16**

Cash also asked what financial obligations were being requested of Sunnyvale, towards the provision of low-income housing, and explained to Mayor Strauss that Sunnyvale lacked many of the amenities necessary to support low-income housing development in Sunnyvale at that time. Cash's letter to Mayor Strauss was sent *after* the present lawsuit was filed.

Cash also testified that he received a letter dated March 6, 1992, from then Dallas Mayor Steve Bartlett once again "requesting that the City of Sunnyvale as well as other cities in the Dallas metropolitan area consider entering into a cooperation agreement with DHA to allow the development of a reasonable number of assisted housing units by DHA within your city limits for persons eligible for low rent public housing." By letter dated March 20, 1992, Cash did not positively respond to Mayor Bartlett's request but again requested further information before Sunnyvale would commit. The Court credits the testimony of Paul Cash.

## III.   THE FACTS

Based upon the evidence presented at trial and upon the credibility determinations just made, these are the Court's findings of fact as required by Fed. R. Civ. P. 52.

### A.   The Plaintiffs

Plaintiff Mary Dews was employed as a tenant counselor and advocate at the Dallas Tenants' Association, a nonprofit corporation providing information, counseling, referral and advocacy services to tenants in the Dallas area. Ms. Dews filed suit in this Court on July 8, 1988, seeking injunctive relief, costs, and attorneys' fees against Defendant Sunnyvale. Unfortunately, Mary Dews passed away in December of 1991.

On March 3, 1989, the Court granted permission for Hammer-Smith Construction Co. ("Hammer-Smith") to intervene as a plaintiff. Hammer-Smith is a minority-owned, real-estate

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 17**

development company that had hoped to develop multi-family housing in Sunnyvale but was denied a variance from the Town's one-acre zoning ordinance.

On May 19, 1994, the Court granted permission for The Walker Project, Inc. ("WPI") to intervene as a plaintiff. WPI is a non-profit fair housing organization created and funded by the consent decree entered in *Walker v. HUD*, CA 3-85-1210-R (N.D.Tex., J. Buchmeyer). WPI provides counseling and advocacy services to low-income tenants in the Dallas area. A majority of WPI's clients are low-income, African-American households who are seeking assistance in obtaining decent, safe, and sanitary housing at a cost that they can afford to pay. Many of these families either receive financial assistance through a federal, low-income housing assistance program, such as Section 8[8], or are eligible to receive such assistance.[9]

### B.      The Defendant

Defendant Town of Sunnyvale, Texas is a general law municipal corporation organized pursuant to the laws of the State of Texas. The Town was incorporated in 1953. Sunnyvale is located in the extreme eastern portion of Dallas County, with the City of Garland located to the north and the City of Mesquite located to the south and west. Sunnyvale is flanked on the east by Lake Ray Hubbard. U.S. Highway 80 passes through Sunnyvale. Sunnyvale contains approximately 10,703 acres of land, over 6,000 acres of which are put to agricultural uses,

---

[8]42 U.S.C. §1437f. Landlords who participate in the Section 8 program receive only a portion of the rent from the tenants — e.g., a maximum of 30% of adjusted gross income in the case of a Section 8 certificate — and the Dallas Housing Authority pays the balance of the "fair market rent" with funding from the U.S. Department of Housing and Urban Development.

[9]The waiting list for Section 8 vouchers in the Dallas metropolitan area is approximately 4,000 names long, and those individuals who remain on the waiting list will wait for approximately two years before receiving a voucher. *See Dallas Morning News,* 5/18/99.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 18**

primarily as range land for cattle.  Development in Sunnyvale has been sparse because most of

the land in Sunnyvale is owned by three prominent families:  the Mayhews, the Luptons, and the

Smiths.  The Smiths own approximately 800 to 900 acres near Lake Ray Hubbard, which they

have never attempted to develop.  The Luptons own in excess of 1,000 acres, which currently are

under review for development.  And the Mayhews own approximately 1,196 acres.  The

Mayhews have attempted to develop their land only once, with the unsuccessful Mayhew Ranch

Planned Development application that became the subject of litigation resolved in state court.[10]

According to the population statistics promulgated by the North Central Texas Council of

Governments ("NCTCOG"), the population of Sunnyvale was 969 in 1960, 995 in 1970, 1,404 in

1980, 2,228 in 1990, 2,300 in 1994, and 2,400 as of January 1, 1997.  According to NCTCOG

projections, Sunnyvale is expected to grow to a population of 4,000 by the year 2010, with a

growth rate of 2.9% per year from 1990 to 2010.

Sunnyvale presently has a staff of nine employees and a volunteer fire department.  The

Town is dependent upon its contractual relationships with the Dallas County Sheriff's Office for

law enforcement; an outside company for emergency medical services; Dallas County for street

and road repair; the North Texas Municipal Water District for water supply; the cities of

---

[10]In *Mayhew v. Town of Sunnyvale,* the Mayhews alleged that the Town's denial of their planned development application violated their state and federal constitutional rights to substantive due process, procedural due process and equal protection.  *See Mayhew v. Town of Sunnyvale,* 964 S.W. 2d 922 (Tex. 1998).  The Mayhews further alleged that Sunnyvale's decision constituted a taking of their property without just compensation.  *See id.*  The case winded its way through the Texas state courts until the Texas Supreme Court ultimately decided that the Mayhews had not been denied any of their constitutional rights.  *See id.*  Although the Mayhews had originally included an allegation that Sunnyvale's zoning ordinance had a disproportionate impact on racial minorities, at trial they stipulated that they abandoned any allegation of racial animus, and this claim was therefore never adjudicated by the state courts. *See id.* at 939.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 19**

Mesquite and Garland for sanitary sewer services; and the city of Mesquite for additional fire protection services.

Sunnyvale's municipal facilities consist of (a) one small metal building of about 4,000 square feet that serves as the Town Hall, offices all of the Town's employees, and contains a council chambers; (b) two small 2,400 square feet fire stations, each of which has two pieces of fire equipment; and (c) a 100,000 volume library. Sunnyvale has one small park that contains a few pieces of playground equipment, but no baseball or football fields.

Based on NCTCOG estimates, Sunnyvale had approximately 800 jobs in 1990. Of these jobs, an estimated 88% were in basic employment sectors (mining, construction, manufacturing, wholesale trade, transportation, communications and utilities). NCTCOG projects Sunnyvale will have 1,700 jobs by the year 2010. Sunnyvale's employment centers consist of three manufacturing and distribution companies that are all located in the southern portion of Sunnyvale, south of I-80.

The 1990 U.S. Census reported that the population of the Town of Sunnyvale was 2,228 people, including 2,094 whites of non-Hispanic origin, 16 blacks, 20 Asians, and 82 Hispanics. Thus, Sunnyvale's population was 93.99% white and 0.72% black.[11] The 1990 Census of Population and Housing also reported that of the 740 occupied housing units in Sunnyvale, including owner occupied and renter occupied units, 718 were white while 7 were black. Thus, the percentage breakdown of Sunnyvale's households was 97% white and 0.95% black.[12]

_____

[11]Pl's Ex. 70.

[12]Pl's Ex. 71.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 20**

## C. Sunnyvale's Zoning and Planning Laws

### 1. The 1965 Comprehensive Plan

A comprehensive plan is a guideline that sets land use policy for a municipality and provides the framework for zoning and development decisions. A plan should be monitored on an annual basis and amended every 3 to 5 years, to reflect changing conditions in the community. Under state law, once a comprehensive plan is in place, all zoning decisions must be consistent with the plan.

Sunnyvale adopted its first comprehensive plan in 1965. That document provided that Sunnyvale was incorporated in 1953 for the following reasons:

> to forstall [sic] the community being developed in a substandard manner and to preserve the area until the time the proper development could be assured. The relatively high development standards adopted by the City has naturally resulted in little growth, but the growth which has occurred is of exceptionally high quality. This was, in fact, the intent of the original founders of the community. Their basic thought was to discourage premature development, which would have resulted if small lot developments would have been permitted without water and sewer service.[13]

The "premature development" feared by the Town was residential development planned for black households. Beginning in 1948, in response to the dire need for improved housing for black people in Dallas, the Dallas Home Builders Association Committee on Negro Housing led an effort to find unincorporated areas in Dallas County for the development of federally-subsidized "Negro Housing."[14] One of the first areas proposed was in the southeastern part of the County, within a mile of Mesquite's western boundary and close to what was soon to become

---

[13]Def.'s Ex. 141 at 19.

[14]Pls.' Ex. 139.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 21**

Sunnyvale. The incorporation of Sunnyvale in 1953 removed a large area of land as a potential site for development of housing intended for black families.

The land use survey taken in January of 1965 and relied upon in the 1965 Comprehensive Plan showed that only 7.18% (907 acres) of the total amount of land in Sunnyvale (12,637 acres) was developed.[15] Of the 907 acres of developed land, 190 acres (20.97%) were classified as single-family residential, .46 acres (.05%) were for duplexes, and another .46 acres (again .05%) were for apartments.[16] The City had a total population of 1,060 people at that time.[17] The 1965 Comprehensive Plan estimated the population holding capacity of Sunnyvale's urban area to be approximately 42,000.[18]

The Plan expressly states that, "[t]he most efficient population density range is between 4.0 and 9.3 persons per acre (2,500 to 6,000 persons per square mile). Lower densities require more services and represent a high [sic] cost in streets, sewers, and water mains than are justified by the revenue received from taxation."[19] After repeating that the original purpose of the incorporation was to stop development of the area until "proper development could be assured," the Plan stated that the original concept of a city served by county type roads, no sanitary sewer service, "and extremely large lots (one and two acres in size)" had served its purpose.[20] Instead,

_____

[15]Def.'s Ex. 141 at 9.

[16]Id. at 12.

[17]Id. at 9.

[18]Id. at 37.

[19]Id. at 15.

[20]Id. at 19.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 22**

the concept of a "rural area" was being replaced by a "complete city concept," with parks, schools, playgrounds, retail, commercial and industrial areas.[21]  However, despite this description in the 1965 Comprehensive Plan, Sunnyvale has yet to zone any of its land for apartments.

The 1965 Comprehensive Plan designated 93.67 acres for apartment development, 3,535.22 acres for single-family residential development on 12,000 square foot lots, and 2,246.38 acres for single-family residential development on estate lots.[22]  The 93.67 acres allotted for apartments constituted one-half of one percent of the total acreage in Sunnyvale.[23]  Despite this specific allocation for apartments, the "Proposed Zoning District Map" did not identify a single parcel for "Duplex or Apartments."[24]  The 1965 Comprehensive Plan was not followed by the Town.  The zoning ordinance passed on August 9, 1965 contained a zoning district map and established four single-family residential dwelling districts:  R-1 (minimum 40,000 square foot lots), R-2 (minimum 24,000 square foot lots), R-3 (minimum 18,000 square foot lots) and R-4 (minimum 12,000 square foot lots).

## 2.    The 1971 Resolution Banning Apartments

On July 12, 1971, the Sunnyvale Town Council passed a resolution banning the development of apartments and town houses in Sunnyvale.  The events leading up to the passage of the resolution are as follows:  In August of 1970, Sunnyvale's Planning and Zoning Committee ("P&Z") received an inquiry from George Drum, a developer interested in putting between 5 and

---

[21]Id. at 19.

[22]Id. at 61.

[23]Id. at 61.

[24]Id. at 66.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 23**

600 townhouses on 89.3 acres on Barnes Bridge Road.  The P&Z asked the Town Council for a joint meeting "to see how the council felt about this kind of development."  Although Drum had hoped to get a hint of the Council's mood before going to the expense of drawing plats, the Council stated in the minutes of its meeting that nothing could be discussed without plats.  Two citizens, George Tucker and T.C. Lupton, spoke in favor of the townhouses at the Council meeting.

A few months later, in December of 1970, the P&Z heard a request from Leon Wilensky, a prospective purchaser of a 46.5-acre tract of land on Belt Line Road.  Wilensky intended to build one- and two-bedroom apartments at a density of 20 units per acre.  A vote of the P&Z on Wilensky's request resulted in a 2-2 tie, and Wilensky's application was tabled.  Appearing before the P&Z in January 1971, Wilensky showed an artist's rendition of the townhouses he wanted to build and answered the committee's questions.  One of the questions was, "Then the construction could be low-income housing that would be a liability to the community?"  Wilensky answered "no."  A concerned citizen at the committee meeting commented that apartment complexes were difficult to police and would encourage crime.  Other citizens vocally indicated that they were "especially opposed to apartments," due to the presumed tax increases to expand the school system and public utilities.  A P&Z member, J.C. Hardie, stated that apartments would be a "[c]ancer spreading in the community."[25]

A fellow P&Z member, Huey Whitehurst, pointed out that the commission lacked the authority to ban apartments since there was an ordinance ostensibly permitting construction of apartments, and that the decision to ban apartments lay with the Town Council.  The P&Z

---

[25]Pls.' Ex. 153.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 24**

ultimately denied Wilensky's application by a vote of 4-2. The Town Council took no action on Wilensky's rezoning request except to vote for the P&Z to discuss the matter more fully.

In May of 1971, Alderman L.R. "Bill" Orr moved that the council delete regulations for apartment houses from the zoning ordinance, thereby banning apartments "until such a time that we are able to come up with good specifications whereby we can really control the construction from the ground up, through supervision and ordinances." According to Orr, such a measure would "keep our area from trashy construction." The motion passed by a vote of 3-1, with one member abstaining. At a council meeting on June 14, 1971, City Attorney William Andress advised the council that it would be better to write a resolution forbidding permits for multifamily dwellings "until such a time that Sunnyvale has sewage, better water facilities, and a better building specification for that type of construction."

The resolution banning apartments was passed on July 12, 1971. The resolution recites that although multifamily use is included in the ordinance, the town had never designated any specific area for multifamily use and feels that it is advisable to withhold designation of an area and withhold issuance of permits for apartments. The resolution provides:

> Section 1: That until ample municipal services can be furnished to such development, no area shall be designated, nor any application for rezoning be accepted, for Apartments or Town Houses.
> Section 2: That definite rules and regulations be written for the construction of this type of building prior to approval of any designated area, plat or building permit.[26]

When the council met the following month, Alderman Orr reported that he had received calls from several real estate companies "condemning" Sunnyvale's ban. City Attorney Andress reported that he had also received calls complaining of the ban. Orr then suggested that a

---

[26]Pls.' Ex. 143.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 25**

committee be appointed to encourage industrial development in Sunnyvale.

A few weeks later, when the apartment resolution was discussed by Sunnyvale's Planning and Zoning Commission, the resolution was given "enthusiastic approval." There is no record that Sunnyvale ever rescinded the resolution. Although the 1987 Zoning Ordinance includes a description of an apartment district, the Zoning Map does not designate an area for apartments. The current zoning ordinance does not contain an apartment district or regulations for the development of apartments. There is no land currently zoned for apartments.

One of the conditions set by the 1971 ordinance for issuance of apartment building permits remains directly under Sunnyvale's control. The 1971 ordinance provided that no such permits would be issued until "definite rules and regulations be written for the construction of this type of building prior to approval of any designated area, plat or building permit." As of today, Sunnyvale has not drafted any such rules.

To attract commercial businesses, Sunnyvale publishes and distributes a pamphlet to businesses and industries that might be interested in locating in Sunnyvale.[27] The "Housing" section in the pamphlet makes it clear that the only type of housing allowed in Sunnyvale is low-density, single family housing. The apartments, presumably for the workers, are in other cities:

> **HOUSING**
> Located along the eastern edge of Dallas County, Sunnyvale offers a unique and distinctly peaceful living and working environment when contrasted to the fast-paced tempo of metropolitan living. Sunnyvale provides the slow-paced, friendly atmosphere of a rural area while located only twenty minutes from downtown Dallas.
>
> Sunnyvale restricts housing construction to low density, single-family dwellings requiring one-acre lots or larger. However, the widest selection of homes, apartments, condominiums, and town houses are conveniently located in the adjoining cities of

---

[27]Pls.' Ex. 208.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 26**

Garland, Mesquite, and Northeast Dallas.

3.     **The 1973 One Acre Zoning Ordinance Amendment**

In March of 1972, the Town Council asked for an ordinance to govern the installation of

septic tank systems.  At a December 1972 meeting, City Engineer H.G. Howard reported that

after research and contact with the North Texas Municipal Water District, he was recommending

a one-acre minimum for residential lots served by septic tanks within 2,000 feet of the lake and

for homes of 3,000 square feet or more.[28]  Howard added that for smaller homes on septic tanks,

half-acre lots should suffice in most instances.  The Town Council decided to meet with the

Planning & Zoning Commission to discuss restricting new homes to one-acre lots until sewer

lines become available.  When the council and P&Z met to discuss lot sizes, the two groups

decided a public hearing should be held to debate the issue.

P&Z Chairman H.H. Hatley opened the January 1973 public hearing by explaining that

discussions of "current problems in the community" had prompted his commission, the Town

Council, and the city engineer to consider "upgrading" Sunnyvale's zoning ordinance.  City Engi-

neer H.G. Howard further explained that the upgrade is necessitated by the problems of "having

only septic systems, inadequate water lines for any concentrated development, as well as the

school presently being at maximum capacity."

Numerous citizens spoke in favor of a minimum one-acre lot size, citing their desires for

Sunnyvale "to continue to have a spacious, country living atmosphere" and their objections to

"small, low-cost housing on small building sites."  Once public discussion ceased, a vote was

taken.  At least forty Sunnyvale residents voted in favor of the one-acre minimum, and no one

---

[28]Pls.' Ex. 154.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 27**

objected to the proposal. When Hatley asked the audience if they wished to lower the size of the building site if a public sewer was available, they emphatically voted no.

In February 1973, the council set a public hearing on the zoning ordinance upgrade. However, at Mayor Mayhew's suggestion, the council unanimously voted to review and approve the ordinance, as written by the P&Z, prior to the public hearing.

At a March 1973 public hearing on the proposed one-acre zoning, Alderman Gibson mentioned that he and Alderman Payne "had been trying for a year and a half to get the zoning ordinance upgraded to protect Sunnyvale." Alderman Gibson saw the ordinance as prohibiting "large type growth" that would cause increased taxes. By a show of hands, the residents present at the hearing voted 28-13 in favor of one-acre zoning. The one acre zoning ordinance was applied throughout the Town without regard to the availability of municipal water and sewer systems.

It is also clear that Sunnyvale officials recognized that septic tanks were becoming less of a problem as time passed, for they initiated an effort in 1978 to change the one-acre minimum so as to provide for half-acre lot zoning. The then mayor reasoned that the zoning change would improve the tax base for Sunnyvale by attracting industry. But the proposed change was rejected amidst strong opposition. Some of the concerns expressed by opponents were school overcrowding and the desire to preserve Sunnyvale's open space and country atmosphere---concerns that were unrelated to septic tank problems.

### 4.     The 1986 Revision of the Comprehensive Plan

On November 24, 1986, the Sunnyvale Town Council adopted a revised comprehensive plan. While comprehensive plans are intended to be updated every three to five years, the 1965

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 28**

Comprehensive Plan was the first and only other plan the Town had adopted.  The adoption of the 1986 Comprehensive Plan was preceded by public hearings and workshops.  Sunnyvale began engaging in discussion about the need for a comprehensive land use plan as early as October of 1985.  By late January of 1986, Sunnyvale had hired the planning firm of Hogan and Rasor to conduct a revision of its Comprehensive Plan and to serve as the Town's planner. Joseph Pobiner was the principal person from Hogan and Rasor to serve as the Town's planner.

By means of a letter dated July 7, 1986, Pobiner submitted his "Draft Comprehensive Plan - Land-Use, Thoroughfare, and Population Components" to Sunnyvale's mayor, council members, Planning and Zoning Commissioners, and the Citizen Committee members. The draft of the plan contained the following statements:

> The greatest amount of developed area is attributable to low density residential (13.1%), exclusively single-family detached dwelling units. However, unlike other municipalities, there are no medium-density, multi-family or mobile home residential areas. The present residential zoning requires at least one (1) acre per lot.
> In considering the future of the Town, the one-acre zoning must be addressed. It was instituted to maintain the 'rural' atmosphere in the Town and prevent urbanized development (such as has occurred in neighboring cities). However, this approach will only result in a 'larger version' of tract-style housing and actually detract from the atmosphere.[29]

Pobiner proposed 5,057 acres for Low Density Residential, 314 acres for Medium Density Residential, and 202 acres for Multi-family residential.  Applying average densities (persons/acre) for each of these land-use types, Probiner projected the ultimate population in each area.  The persons-per-acre densities were 6.76 for Low Density Residential (LDR), 15.55 for Medium Density Residential (MDR), and 30.75 for Multi-Family Residential.  The overall

---

[29]Pls'. Ex. 64 at 3.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 29**

average density was set at 8.13 persons/acre.[30]

At the Town Council's August 19, 1986 public hearing on the proposed Comprehensive

Plan, Pobiner recommended capping Multi-Family at 15 units per acre.  It was at this hearing that

Pobiner informed Sunnyvale officials of the need to provide for multi-family housing in the

Comprehensive Plan:

> [T]he reason for multi-families, in general, is that . . . the City is under the
> auspices of the U.S. Supreme Court to provide . . . a variety of housing
> opportunities, a variety of housing opportunities for everybody, without having,
> and if you'll see on your zoning . . . map that you do not provide for specific
> multi-family uses . . . they haven't been shown on the zoning book.  You see,
> without providing for that you are subject to . . . a lawsuit under which is called
> exclusionary zoning. And there have been many lawsuits filed on that in recent
> years all of which have gone against the cities because . . . the exclusionary zoning
> is considered a discriminatory practice . . . .[31]

Pobiner suggested placing multifamily housing units in several locations where nothing

else would go.  He emphasized both the legal need for apartments and the very low, token

amount of apartment zoning, 1% as compared to 10% or 20% for towns of similar size.  Town

Council member Eloise Patrick stated that the Town's attorney had advised that while the

Comprehensive Plan had to provide for some multi-family housing, "whether you actually allow

it to be built out as [sic] another whole ball game."[32]

Pobiner then recommended including multifamily housing in the Comprehensive Plan to

avoid a lawsuit by the "ACLU or the NCAA, the NAACP."  Pobiner explained that it was in

Sunnyvale's best interest to allocate for multifamily housing, but that he would exclude it from

---

[30]Pls.' Ex. 64 at 12.

[31]Pls.' Ex. 59 at 10.

[32]Pls.' Ex. 59 at 16.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 30**

the plan if so directed by the town.

It was clear that Sunnyvale residents did not agree with Pobiner. During the August 19, 1986 public hearing on the new Comprehensive Plan, Sunnyvale residents made it clear that they were opposed to apartments and multifamily districts in their town. Some of their comments, as reflected by the minutes of the meeting, included:

> Mr. Connie Pullen: . . . . You're using an example of Garland and Mesquite and they are a total disaster with their town houses and their apartments. Mesquite is allowing 28 units to the acre; Garland is completely litterated, yet you're saying that Sunnyvale must allow us 15 units to the acre so that we can be a planned disaster as well.

> Mrs. Tucker: ... if the federal government ever got whiff of this town of Sunnyvale, where are all of our, where is our proportion of housing for underprivileged people? Where in the name of thunder is all of multiple housing? Where is the housing for our blacks? Or Mexicans? We don't have it Connie. I would like to sit here and .... No we don't. Oh come off it. We don't have it and you know it... This town is wide open and if we have to go to court and all of it comes out, that what we have been getting away with here for years and years and years, there isn't going to be a backyard safe from builders who don't give a darn.

> Mr. Ron Davidson: ... We'll build that fence up, we'll hold that gate there and as long as we can hold those Indians off, fine. And, when they bust through then we pay the price... there's an over abundance of multi-family housing around here and what not like that. But, we're boxed in... personally, I'd rather not see any apartments or any cottage homes in Sunnyvale. Period.[33]

By September 1986, the proposed densities were considerably lower, and the amount of land designated for higher density uses had decreased. In a September 9, 1986 letter to the Sunnyvale Town Council and Town Administrator, Pobiner proposed a plan that eliminated the "Multi-Family Residential" category. The Plan allocated 5,228 acres for Low Density Residential at 2 units per acre, and only 166 acres for Medium Density Residential at 5 units per

_____

[33]Pls.' Ex. 59 at 10, 12, 23-24.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 31**

acre.  The Comprehensive Plan contained a new category called "Cluster Residential" with an allocation of 110 acres at 8 units per acre.  Cluster Residential was essentially designated for multifamily uses, which Pobiner stated was necessary because the Civil Rights Act of 1968 required that each community provide a range of housing options for various income levels.

Yet, Pobiner told the Town Council that this draft of the plan was not a solid base land plan because developers would not build at the low densities of 6 to 8 units per acre in the Cluster Residential district.  Pobiner suggested that the more prudent route is to adopt a low density with a maximum of 1 to 2 units per acre, medium density with a maximum of 3 to 4 units per acre, single family detached cluster housing with 5 to 9 units per acre, and a multifamily housing with 12 to 15 units per acre.

Nevertheless, by October 13, 1986, upon request by Sunnyvale to rework his proposals, Pobiner had replaced medium density areas with low density areas, eliminated most areas for multifamily, and moved the remaining multifamily, 0.4% of the total units, to various locations on the fringes of Sunnyvale. There were not enough multifamily units to meet the market for apartments in Sunnyvale.  The then town attorney, Alex Bickley, explained that the plan would be difficult to defend in court without multi-family uses in the plan.

The final draft of the Comprehensive Plan was presented to the Town Council for a vote on November 24, 1986.  At this council meeting, Pobiner clarified that as a professional planner, it was not his intent to recommend the one-acre zoning over 90% of the town, as currently existed in the Plan.  The adopted 1986 Comprehensive Land Use Plan included 5,596 acres zoned for residential use, which was classified as follows:  Low Density Residential-- 4,864 acres or 86.92% of the total residential land, Medium Density Residential--559 acres or 9.99%, Cluster

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 32**

Residential--108 acres or 1.93%, and multifamily residential--65 acres or 1.16%. The Plan was silent on  recommended densities for the various land use categories. The Land Use Map placed the 65 acres of multi-family residential south of US 80 in an area with no sewer service and adjacent to a flood plain.

## 5.    The 1987 Amendment to the Zoning Ordinance

On August 31, 1987, Sunnyvale considered changes to the Comprehensive Land Use Plan. One of the changes was in the location of the apartment and medium density housing in the Plan's map. The town proposed to move the designated area for  apartments to Belt Line to keep them on the perimeter of the town. Pobiner insisted that it was important for the plan to reflect apartments, medium density, and cluster density in order to shield the City from liability. In fact, in a deposition taken on May 21, 1987 in the *Mayhew* state litigation, Pobiner clearly voiced his opposition to one-acre zoning. He was still Sunnyvale's planner at the time of the deposition. A summary of his deposition revealed the following:

> a. While he used two units per acre as the suggested density for low density residential in the comprehensive plan, he thought that two units per acre was almost to the point of being unreasonable. If the map showed low density at two and medium density at three or five units per acre, then the actual effect would be low density at four acres.[34]
> b. He had been confused by Sunnyvale's insistence on maintaining a country atmosphere since even small towns had apartments and higher density residential areas.[35] He came to understand that the town was opposed to any density over one acre because it wanted to keep out what it termed as an undesirable element.[36]
> c. He used one acre zoning solely at the direction of the Town. His

---

[34]Pls.' Ex. 63 at 88-89.

[35]Pls.' Ex. 63 at 90.

[36]Pls.' Ex.63 at 90-91.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 33**

recommendation was two to four units per acre for low density. There was no sound planning principle for assigning one unit per acre for such a large section of the town.[37]

　　d.  The 1986 Comprehensive Plan was not an appropriate plan for the controlled growth of Sunnyvale. It ignored the issues raised by the need for higher density housing if Sunnyvale is to avoid fiscal deficits in the future.[38]

　　e.  On June 10, 1986, he told the Town Council that one-acre zoning would not achieve the desired open space atmosphere and was of questionable legality.[39]

　　f.  He was unwilling to endorse one acre zoning for low density residential given the lack of other, higher density zoned land in the Town.[40]

　　g.  If the Town had nothing other than one acre zoning, along with non-residential uses, there would be no question that it was exclusionary and discriminatory zoning under the criteria set by the United States Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977), and he had so advised the Town Council.[41]

　　h.  The only good reason for one-acre zoning in Sunnyvale that he could identify was the temporary problem with the septic systems.[42]

　　i.  Development of the Town under one-acre zoning would not result in open space, but rather, the Town would look like a large scale tract development. This opinion had been given to the Town Council. The assignment of one-acre zoning to the entire low density single-family residential classification was not realistic.[43]

　　j.  As Town Planner, he had evaluated the Mayhew Ranch Development proposal. The only negative comment he made was that the proposed multifamily density of 22 units per acre was not a currently allowed density in Sunnyvale. The proposal satisfied all the standards and criteria for approval under the Town's planned development ordinance and would have been consistent with the public

---

[37]Pls.' Ex. 63 at 95.

[38]Pls.' Ex. 63 at 120-21.

[39]Pls.' Ex. 63 at 123.

[40]Pls.' Ex. 63 at 124.

[41]Pls.' Ex. 63 at 131.

[42]Pls.' Ex. 63 at 133.

[43]Pls.' Ex. 63 at 135, 138-39.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 34**

health, safety, and welfare of Sunnyvale.[44]

    k. He heard public officials state that they were afraid of public and federal or state subsidized housing.[45]

    l. The existing zoning map was not in accordance with the comprehensive plan.[46]

Pobiner's concerns were drowned out by the Sunnyvale residents' cries of opposition that were further voiced at the January 12, 1987 Town Council meeting discussing the Mayhew proposal to develop multifamily units. The minutes of the meeting reflect the following comments:

> Mr. Allen: . . . We lived in Mesquite for 17 years . . . and we left because of the terrible effects that high-density development can have on what would otherwise be a great neighborhood. . . . We don't need apartments. We don't [sic] town houses. We don't need little bitty houses all jammed up together on fractional acre lots . . . .

> Mr. Burks [identified on page 62]: . . . Police protection, you know, the reason that we're going to need more police protection from what I've seen in the areas that have apartments and condominiums, you know, the slum areas and things like this, those kind of characters coming in don't have the land ownership values that most of us in here tonight have and it requires more police protections to keep them out of my house and keep them out of your house and keep them from breaking in so they can afford to live in these apartments . . . .

> Ms. Yates: . . . This literally scares me to death. When I started looking for a home -- we lived in Dallas for 17 years. Our area was blotted with apartments. If you left a screwdriver, believe you me, in two hours it was gone. Out here we at least have piece [sic] of mind. We don't have a nomadic lifestyle that apartments, town houses and condominiums bring. They're here today and gone tomorrow, no type of community affiliation at all; and that's one reason I am against it.

> Floor speaker [unidentified]: Mr. Sanders, could I ask a question? I'd like to ask the Council. Are they going to take rent slips on these apartments when they

---

[44]Pls.' Ex. 63 at 175, 178-79.

[45]Pls.' Ex. 63 at 189.

[46]Pls.' Ex. 63 at 203-04.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 35**

move out of West Dallas?  Are they going to take rent slips?

Mayor Pro Tem Robert Sanders:  I'm sorry.  I can't remember your name, but they don't even have apartments, yet.  It's up to the City now to determine.

Floor speaker:  Do they take rent slips?

Mr. Sanders:  I don't know the answer.  I don't know if they know.  You can ask him after the meeting if you would like.[47]

At the end of the meeting, Town Alderman Carroll Brown insisted that he had been "telling them that apartments weren't coming into Sunnyvale period."  Town Alderman Mayor Pro Tem Robert Sanders concurred and stated that he needed to hear from Alex Bickley, the Town Attorney, on "what justification, what elements of that justification have got to be in place" before he voted against the Mayhew proposal.

After the adoption of the 1986 Comprehensive Plan, Sunnyvale amended its zoning ordinance.  The amended ordinance did not comply with the Plan. The ordinance described three single-family districts, and each district required one unit per acre.  Although the duplex district was not described in the Plan, it was included in the zoning ordinance at a density of 2 units per acre.  The multifamily district density was set at a maximum of 4 units per acre and a minimum lot size of five acres.  There were no medium density single-family districts or cluster residential districts in the zoning ordinance.

The actual zoning map did not include any residential use districts other than the one-unit-per-acre density districts. These districts still constitute the majority of the residentially zoned land.

_____

[47]Pls.' Ex. 61 at 64, 81, 87, 107-08, 125-26.  The first names of some of the speakers at the meeting were not identified in the minutes of the meeting.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 36**

**6.      Sunnyvale's Refusal to Take Section 8 Certificates and Enter Into Cooperation
Agreements With HUD**

  **a.  Section 8 Certificates**

  In early 1985, the Dallas Housing Authority (DHA) sent a written request to Sunnyvale,

asking the town to permit the use of DHA-issued Section 8 certificates in Sunnyvale.  Plaintiffs'

counsel, Michael Daniel, sent a follow-up letter dated March 8, 1985, requesting that Sunnyvale

consider entering into an agreement allowing families with DHA-issued Section 8 certificates to

look for housing in Sunnyvale.  The Dallas Tenants Association suggested that Sunnyvale initiate

its own Section 8 program and allow DHA-issued certificates to be used in Sunnyvale.

  But in a March 20, 1985 letter, Charles W. Rowland, Sunnyvale's Town Attorney,

declared that Sunnyvale refused to consent to the use of  DHA-issued Section 8 certificates.  The

reason given was that Sunnyvale was having a difficult time providing water and sewer services

to the 650 people already residing in its town.

  Rowland's letter provided misleading information.  First, the 1980 U.S. Census showed

that Sunnyvale's population was 1,404.  Second, the water and sewer problems cited by Rowland

were limited in scope to a small section of Sunnyvale.  In fact, as of 1970,  Sunnyvale's water

lines could supply 8 to 10,000 customers.  It is worth noting that Attorney Rowland is the same

individual who, at the August 19, 1986 Town Council meeting, advised Sunnyvale officials that

showing some multifamily housing in the comprehensive plan would operate to avoid liability

even if no land was actually zoned for multifamily use.

  **b.  1989 Resolution Purportedly Opening Sunnyvale to Low-Income Families**

  Indeed, Sunnyvale did not change its position regarding Section 8 certificates until after

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 37**

this lawsuit was filed in 1988.  It was not until 1989 that the Town Council passed a resolution declaring that Sunnyvale's population was 2,000 residents and that it was "continuing the official policy of an open city which is open to individuals who may hold Section 8 vouchers or certificates from the City of Dallas or the Dallas Housing Authority and to any and all other law-abiding individuals who desire to reside and become residents of the Town of Sunnyvale."[48] This resolution was not delivered to DHA or the City of Dallas or otherwise made public for years.  Defendant Sunnyvale's attorney finally delivered a copy of the resolution to DHA on October 2, 1996.  By then, this civil action had been pending for eight years.

Furthermore, at the time that the 1989 resolution was passed, DHA was already bound by a consent decree that required it to honor Section 8 certificates in the suburbs, whether or not a suburb consented.  *See Walker v. HUD*, 734 F. Supp. 1231 (N.D. Tex. 1989) (App. A).  In *Walker*, Mary Dews and the other plaintiffs sought relief from racial segregation practiced by both the Dallas Housing Authority (DHA) and the U.S. Department of Housing and Urban Development (HUD).  A Consent Decree was entered by this Court on January 20, 1987.  The Consent Decree required, *inter alia*, that DHA locate at least 15% of its Section 8 housing in the Dallas area suburbs.  Defendant Sunnyvale is a municipality located in the eastern portion of Dallas County.  Plaintiffs claim that Sunnyvale's exclusionary zoning deprives DHA of a large geographical area that could be used by individuals holding Section 8 certificates and vouchers.

### c.      Cooperation Agreements

Throughout the 1990s, both the City of Dallas and the Dallas Housing Authority requested numerous times that Sunnyvale enter into a cooperation agreement with DHA.  With

---

[48]Pls.' Ex. 34.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 38**

such an agreement, DHA would be able to develop and operate public housing units for persons of low and moderate income in Sunnyvale. Without such a cooperation agreement, DHA cannot, under state law, build and own public housing in Sunnyvale. The town consistently refused to enter into an agreement with DHA for various reasons.

Yet, during the same period, Sunnyvale was signing similar cooperation agreements with Dallas County. These agreements included a promise by Sunnyvale to "cooperate to undertake, assist in the undertaking, community renewal and lower income housing activities, specifically urban renewal and publicly assisted housing . . . ."[49] The agreements gave the County the power to select, conduct, and administer housing and community development activities for Sunnyvale.

The reason for Sunnyvale's differential treatment of DHA and Dallas County may be found by examining the client population that was being served. While DHA's targeted clients were and continue to be predominantly African-American, Dallas County's Community Development Block Grant entitlement program, the program embodied in the cooperation agreements between Sunnyvale and Dallas County, serve a population that is predominantly Caucasian. According to the 1990 U.S. Census, the population covered by the cooperation agreements with Dallas County was 83% Caucasian and 11% African-American. That is in stark contrast to DHA's client population which is 90% African-American.[50]

Paul Cash, Sunnyvale's mayor at the time that the town received the request to enter into a cooperation agreement with DHA, testified that he could not sign the DHA agreement because DHA did not provide sufficient details to clarify what Sunnyvale's role would be. Yet, Cash

---

[49]Pl's Ex. 210.

[50]Pl's Ex. 6.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 39**

entered into a similar agreement with Dallas County without any such details being provided.

**7.      1993 Revision to the Comprehensive Plan and Zoning Ordinance**

    **a.      Preparation Process for the 1993 Revision**

In February 1992, the Town hired professional planners to produce a revised comprehensive plan and related zoning and planning documents.  The result was the 1993 Comprehensive Plan, which was adopted on April 12, 1993, and amended on September 13, 1993, replacing the 1986 Comprehensive Plan.  The 1993 Comprehensive Plan embodies Sunnyvale's current land use policies.

The consulting team, which included Wallace, Roberts & Todd, a national planning firm in Philadelphia, and J.T. Dunkin & Associates, Inc., a planning firm local to the Dallas County area, was headed by the Kansas City firm of Freilich, Leitner & Carlisle.  Dr. Robert Freilich is both a planner and a lawyer and had been retained by Sunnyvale back in 1991 to serve as lead appellate counsel in the *Mayhew* state court litigation.  Freilich was also retained by the Town to help resolve the 1992 HUD complaint filed against Sunnyvale by The Walker Project, Inc.  Dr. Freilich has a national reputation as an expert in both urban planning and housing law.  He co-authored a law school casebook that discusses the discriminatory use of exclusionary zoning and has co-authored numerous law review articles on the topic, including one entitled "Exclusionary Zoning: Suggested Litigation Approaches," 3 The Urban Lawyer 344 (1971), which he wrote with G. Allen Bass.  Freilich is acutely aware of the legal ramifications of one acre zoning.  He advised the Town to include higher density development in their plan, for both legal and planning reasons, but the residents of Sunnyvale refused to listen.

The adoption of the 1993 Comprehensive Plan was preceded by a lengthy, open process,

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 40**

which included numerous public hearings and the evaluation of alternative growth scenarios and land uses.  According to Freilich, six policy objectives shaped the 1993 Comprehensive Plan: (1) to discourage sprawl and the premature extension of urbanization outside the urban growth lines, and promote greater infill, less abandonment and more opportunities for growth in the existing areas of urbanization; (2) to discourage inefficient and expensive utilization of energy and fuels for transportation purposes; (3) to reduce fiscal costs of development and avoid overextension of sewer, water and other costly facilities; (4) to protect the environment, particularly where the Town previously had concerns regarding the Duck Creek sewer plant, pollutant overflows and perceived concerns regarding odors emanating from the plant; (5) to preserve agricultural land, consistent with state and national guidelines, through program incentives; and (6) to provide for affordable housing, particularly in the MDR and UDR categories, where the Town anticipated 40% of its future population growth would occur.  These goals did not survive the final draft of the plan.

Sunnyvale's consulting team created three background reports in preparation for the 1993 Comprehensive Plan revisions.  The third of these reports, "Analysis of Plan Alternatives" ("the Analysis"), reflected the joint efforts of the Sunnyvale Plan Update Committee, the P&Z, and the Town staff.[51]  This document proposed three different comprehensive plan alternatives for community discussion:  Alternative 1 – "Rural Development Pattern"; Alternative 2 – "Traditional Development Pattern"; and Alternative 3 – "Clusters and Centers."  The Analysis considered different community design options, including one-acre lot subdivisions, smaller lot subdivisions, planned development concepts with incentives, and neo-traditional planned

---

[51]Pl's Ex. 44.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 41**

development concepts.  It also provided an analysis of environmental impacts, community

impacts, public facilities impacts, fiscal issues, timing and phasing considerations, regulatory

issues, and consideration of Sunnyvale's regional role.  From this Analysis, Sunnyvale's residents

and community leaders were to create a preferred alternative that reflected the concepts and

general direction most compatible with the community's objectives.

Alternative 1 was described as a "Rural Development Pattern" with densities lower than

those in the 1986 Comprehensive Plan.  Alternative 1 did not include an Urban Density

Residential (UDR) land use category.  It provided for only 274 acres, 548 units, and 1,582 people

in the Medium Density Residential (MDR) category.  Alternative 1, among other goals, aimed at

preserving open space and agricultural land uses.

Alternative 2 was called the "Traditional Development Pattern" in which development

would occur in grid-like fashion with most lots consisting of one to two acres.  It provided for

290 acres, 2,061 units, and 5,956 people in the UDR category, and 460 acres, 920 units, and

2,660 people in the MDR category.  MDR was described as single-family residential

development, with typically 2 to 5 units per acre.  The UDR density was described as "more than

5 units per acre" with typical development to be "patio homes, townhouses, or apartments."

Alternative 3, the "Clusters and Centers Alternative," was described as a distinctive

residential development approach with the means to efficiently accommodate and provide

services for future development while retaining more land in very large residential lots,

agricultural use, or open space.  Alternative 3 provided 450 acres, 3,148 units, and 9,096

residents at an Urban Density Residential rate of more than 5 units per acre so as to permit

development of patio homes, townhouses, or apartments.  It also allotted another 2,011 acres,

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 42**

4,023 units, and 11,626 residents at the Medium Density Residential rate of 2 to 5 units per acre in single-family residential development. All three alternatives identified locations for assisted housing "at densities over 2 units per acre."

Freilich's analysis of the impacts of each alternative revealed that the "Clusters and Centers" Alternative 3--the one that permitted the most units at the highest densities and included apartments -- was the best choice across the board.[52] Freilich reasoned that Alternative 3 would better preserve stands of trees and other important natural features. It had significantly less impact on agricultural land resources. Alternative 3 had less land in urban use than the "Traditional" alternative. Neither the "Rural" nor the "Traditional" alternative provided for the retention of country lanes, while "Alternative 3 offered the potential to provide for new growth yet retain the rural character of many roadways."

Alternative 3 offered the greatest opportunity to implement the regional open space plan. It would have less negative impact on air quality than "traditional" development because the clustered development reduced driving distances within neighborhoods. Moreover, Alternative 3 provided the most efficient pattern for development and support for affordable housing. Freilich further stated that Alternative 3 was best able to accommodate the various levels of housing demand under the full range of growth that Sunnyvale was expected to experience.

According to Freilich's analysis, all three alternatives would demand significantly more water service than currently used but not more than was available under the water contract. Alternative 1, the "Rural" option, would require the greatest expense in constructing and maintaining the sewer system. Although Alternative 3 would give way to a higher demand for

---

[52]Pl's Ex. 44.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 43**

sewer service, it was the most "efficient and cost-effective development pattern" for constructing and maintaining sanitary sewer lines. Alternative 3 would require fewer streets than the "Traditional" development. The costs of fire protection were twice as high for the "Rural" development as they were for Alternative 3. Police protection would cost more in Alternatives 2 and 3.

Freilich's analysis further concluded that, because of the clustered pattern resulting in less land in urban use and requiring urban services in particular areas, Alternative 3 would have "the best fiscal impact of the three alternatives." Alternative 3 also provided "the best opportunities for effective timing and phasing of infrastructure extensions and service provision." By comparison, while the "Rural" development pattern created the rural edge, it did not "contribute to the creation of regional open space networks" unless land owners voluntarily left their land in pasture. The "Traditional" development alternative did not include a means to limit the extension of denser development and thus did not create "'an edge' for the metropolitan area." It made no "explicit contributions to the regional open space system" or to the transportation network.

In summary, Freilich's analysis concluded that the "Traditional" alternative would have the most severe impacts on environmental areas, agriculture, and open space. Under the "Rural" alternative, these impacts could be avoided if the large land owners chose to do so since the minimum lot sizes were larger. In contrast, "Alternative 3 retains more extensive environmental, agricultural and open space areas due to the clustering of new development. It also offers the best opportunity for permanent retention and public access to these areas."

Therefore, Freilich's analysis determined that Alternative 3 was best suited to achieving

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 44**

the stated regional goals and objectives:

> Alternative 3 is the most successful in achieving these regional objectives. It
> creates a transitional land use pattern. Since the development is located in clusters
> and centers, the easterly edge of the Town can be delineated as a regional edge.
> The open space connections are an integral part of Alternative 3. This alternative
> also provides the greatest opportunity for development of some affordable
> housing and for a relatively lower impact on regional air quality.[53]

**c.      The Town Rejects Freilich's Recommended Alternative**

Just as they had previously ignored the legal and planning advice of Joseph Pobiner when

drafting the 1986 revisions to the Plan, the residents of Sunnyvale again selected the land use

alternative with one acre zoning, rather than the planning alternative suggested by their hired

consultants.  Freilich's recommendation, which was based on both the legal problems with one

acre zoning and the fiscal and environmental problems, was essentially ignored.

The following comments were made during the Town Council meetings held on October

19 and November 2, 1992:[54]

> Frank Tilley [Sunnyvale Plan Update Committee member] - To my way of
> thinking the Town clearly doesn't like UDR. If you got to have it then that's a
> better place to have it basically up against Mesquite. And that would also probably
> effectively lower the population.

> Bill Estabrook [Town Council & Plan Update Committee member] - Can we
> effectively eliminate the option for apartments in Sunnyvale?

> Karen Walz [member of Freilich's planning staff] - I don't think you should but
> I'm not going to make a legal opinion about it. I don't think it's a good idea. I
> think it is important to provide some places for that type of units.

> Jim Pruitt [P&Z and Plan Update Committee member]- The issue of what is
> economically feasible, that's the whole issue behind all of this.

---

[53]Pl's Ex. 44, at 78.

[54]Pl's Ex. 258.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 45**

<u>Karen Walz</u> - If we were to come and tell you that apartments are most economically feasible, I don't think you are going to change your plan to all apartments.

<u>Jim Pruitt</u> - No our only concern is what is defensible.

<u>Freilich -</u> So it is the higher density that troubles you. You would like to draw the line at some lower density, like the one unit per acre. To start with #1 you already have a finding from the trial judge that the one unit per acre is unconstitutional.

<u>Jim Pruitt</u> - Just as applied to the Mayhew tract.

<u>Freilich</u> - I'm telling you now it also is based on appraisals of property throughout the Town and adjoining towns not just a native tract. It was a pretty broad finding of the court."

<u>Norman Patrick</u> [P&Z member]- The landowners have rights I agree. I think where the biggest fight that we are going to have or I am going to have is the density. That's the key there. Those densities are too high for me and I can't live with them.

<u>Freilich</u> - All you have to do is express what you want.

Then, at the November 4, 1992 Special Town Council meeting, the following exchange ensued out of the presence of either Freilich or any of his planning staff:[55]

<u>Jim Wade</u> - Let's go over the UDR. I noticed we always talked in our notes ... because it is different than they told us on Monday night. We had always talked about 5 or something more than 5 dwelling units per acre. I noticed in this letter we got from Richard Bartholomew [a member of Freilich's staff] that it is now being defined or he has recommended 12-15 dwelling units per acre. Is that what we anticipated as more than 5? Certainly isn't what I thought as more than 5. Do we need to fine tune that just a little bit? I never recalled discussing 12-15 dwelling units per to an acre, that pretty much means 2 or 3 story apartments to me and big parking lots.

<u>Bill Estabrook</u> - Can we set a definition that no residential building be more than two stories? Is that pliable? I was figuring 5-6 d/u's maximum...I really didn't want apartments period. I didn't even want to see it, but something like townhomes or something like that and we limit the numbers...they can't have

---

[55]Pl's Ex. 258.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 46**

more than 8 or 10 in one group..so we don't get these huge areas that start causing trouble because it breeds a lot of things...if we have to do that as part of UDR.

Pete Allen - Why do we have to have any? If we look at the regional picture as these people keep asking us to, within any reasonable radius around this Town there are zillions of apartments. I don't think anybody can say there is a shortage. I would prefer not have any attached housing.

Bill Estabrook - Can we get away without having any?

Paul Cash [Mayor] - Everybody in here prefers not to have them.

Bill Estabrook - We also have to think about whether it's something that is going to be able to get through the court system if someone decides to sue us too though....it says we are discriminating.

During the November 4, 1992 Town Council meeting, Sunnyvale officials concocted

several options in order to avoid development of apartments in Sunnyvale. These options

included relying on the existing apartments in Mesquite and Garland, locating the Urban Density

Residential (UDR) district south of US 80, or limiting the number of units built at any one time

in Sunnyvale. The following discussion is an excerpt of the minutes of the meeting:[56]

Bill Estabrook - What if instead of apartments we said townhomes? Do you think we could just go that low and not have to go to apartments? Can we define UDR that it doesn't go any lower than townhouses?

Robert Ewalt [Town Administrator] - You don't have to have apartments but you might consider that you have to have townhomes in other words one unit up and down. That is a definition of townhomes. You can have those and you don't have to have apartments, because they serve the same purpose.

Debra Pruitt [Town Council member] - You have to have some designation in the City of attached housing. You can limit it to townhomes.

Connie Pullen [Mayor Pro Tem] - You are talking about attached housing right on the border of Sunnyvale right at the creek bed where it ought to be.

---

[56]Pl's Ex. 258.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 47**

Debra Pruitt - And that's the only place. (laughing).

Jim Pruitt - Which side of the creek bed? (laughing)[57]

Connie Pullen - I'm afraid it's on the east side. East not west.

Cindy Worley [Plan Update Committee member] - I'm still concerned about the letter suggesting that we need something 12-15 units. Is that a legal perspective?

Paul Cash [Mayor] - No that is a land planner's definition. I think they have already begun to change their definition around to the Sunnyvale definition of these densities.

Jim Pruitt - Think getting paid had anything to do with that?

Bill Estabrook - The basic approach was to get the smallest amount we can get away with.

After reading such comments from Sunnyvale officials, it is no surprise that the five categories of residential land uses in Freilich's Analysis of the Alternatives underwent a dramatic transformation. In his February 4, 1993 working draft of "Sunnyvale Plan Elements" submitted to the Town Council, Freilich opted for fixed "Base" densities for each land use category, instead of the more general ranges in the Alternatives Analysis.[58] Rural Residential (RR) was at least 2 acres. Estate Residential (ER) was 0.8 du/a or 1 unit per acre. Low Density Residential (LDR) was 1 unit per acre. Medium Density Residential (MDR) had been 2 to 5 units per acre under the Alternatives Analysis but was now 1.4 units per acre, which was now lower than the Low Density Residential's 1.5 units per acre that was proposed in the Alternatives Analysis.

The description of Urban Density Residential (UDR) likewise became unrecognizable. Urban Density was 2.5 units per acre, whereas UDR under Freilich's Alternatives Analysis had

---

[57] The west side of the creek bed is in the flood plain. *See* Def.'s Ex. 238-A, App. C-1.

[58] Pl's Ex. 46.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 48**

been described as "more than 5 units per acre." In fact, a member of Freilich's planning staff indicated that the apartments in UDR would have been from 12 to 15 units per acre under the Alternatives Analysis, while the average density for UDR land would have been 7 units per acre. On the other hand, the draft's proposed UDR density now paralleled the proposed density range previously set for MDR under the Alternatives Analysis. The draft stated that for UDR, "[b]onus densities in excess of 6.0 DU/A may be approved for project including assisted housing or senior housing." The uses allowed in UDR now included single-family units and garden apartments.

The net effect of the revision was to remove all identifying elements of the UDR land use except for its name, and to correspondingly reduce the densities of other residential land uses while retaining the name of a higher density use. UDR became MDR in density; MDR became LDR in density; LDR became ER in density. ER remained the equivalent of 1 unit per acre zoning at 0.8 units per acre. RR increased from 0.2 units to 0.4 units per acre. These new densities became, for the most part, the densities in the adopted 1993 Comprehensive Plan and new zoning ordinance.

Freilich submitted another draft of a plan dated March 22, 1993.[59] In this latest draft, the phrase "garden apartments" was gone from the "Policy Intent" or anticipated uses description of UDR. The sentence "Bonus densities in excess of 6.0 DU/A may be approved for project including assisted housing or senior housing" had also been removed. The final, adopted draft of the 1993 Comprehensive Plan did not use either the phrase "garden apartments" or the word "apartments" in the UDR use description. The phrase "multi-family," was used instead. The final plan had no provision for bonus UDR densities in excess of 6 units per acre. There was no

---

[59]Pl's Ex. 47.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 49**

environmental, open space, sprawl, fiscal or other analysis conducted of the adopted plan.

The Comprehensive Plan Land Use map located UDR in one small section west of Belt Line Road and east of the flood plain. The UDR location was consistent with the intent of the Town Council, announced at the November 4, 1992 meeting, to put UDR only in one location next to the flood plain and Mesquite. The elimination of "garden apartments" and "apartments" from the permitted uses and the substitution of "multifamily" effectively implemented Robert Ewalt's November 4, 1992 suggestion that apartments be eliminated from UDR and that townhomes, one up and one down, be substituted.

The map situated Medium Density Residential, having a base density of 1.4 units per acre and being the only category other than UDR with a density higher than one unit per acre, south of US 80. This area did not have available sewer services. The land zoned MDR was also located immediately adjacent to industrial zoned land.

### d.    Elimination of Housing Goals from the Final Comprehensive Plan

The draft 1993 Comprehensive Land Use Plan included various "Housing Goals" and "Implementation Measures" to achieve those goals. Freilich proposed a set of Affordable Housing Goals and Implementation Measures that would have required actual efforts to provide housing for very low-income households by entering into agreements with the Dallas Housing Authority to fulfill regional needs for subsidized housing. Freilich also proposed a goal that would have committed Sunnyvale to provide locations for apartments. These goals and proposals were excised from the final Comprehensive Plan.

In fact, the draft of the plan was modified in several ways. For example, the word "apartments" was nowhere to be found in the final Plan's section entitled "Housing Element Goals." Initially, the February 4, 1993 draft of the Comprehensive Plan stated:

Policy 8.1    The Town of Sunnyvale should plan locations appropriate for a wide range of housing types, including conventional single family homes, patio homes, townhomes, manufactured housing units and *apartments*, to provide a range of housing alternatives for future

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 50**

residents.[60]

The approved Comprehensive Plan, on the other hand, provided:

> Policy 8.1    The Town of Sunnyvale should plan locations appropriate for a wide range of housing types, including conventional single family homes, patio homes, townhomes, manufactured housing units and *multi-family* units, to provide a range of housing alternatives for future residents.[61]

The elimination of the word "apartments" is consistent with the Town Council's and Town Administrator's decision to exclude apartments as an authorized use in the UDR district.

Additionally, the draft Comprehensive Plan had six housing affordability goals.[62] The final Comprehensive Plan, however, had only four.[63] Apparently, the changes in the Goals and the accompanying Implementation Measures indicated that Sunnyvale did not intend to make any effort to provide any share of the region's need to house very low-income households.

Furthermore, the draft's requirement that "Sunnyvale should participate in regional efforts to provide housing affordable to *metropolitan area residents of all income levels"* is eliminated. (emphasis added). The substituted goal was for Sunnyvale only to "participate in regional efforts to provide affordable housing." Similarly, the requirement that Sunnyvale "should support efforts to provide *very low* income households with housing in a variety of locations, housing types and price ranges" was left out of the adopted plan. (emphasis added)

The requirement that Sunnyvale "should attempt to enter into agreements with [DHA] to provide sites" for subsidized housing under the DHA "housing trust fund monies" was modified to preclude any contact with DHA. The new policy as enacted only required the identification of sites; there was no requirement to attempt to enter into agreements with DHA for the use of those sites.

---

[60]Def's Ex. 107.

[61]Def's Ex. 143.

[62]Def's Ex. 107.

[63]Def's Ex. 143.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 51**

The adopted Comprehensive Plan further revised the proposed Housing Affordability Implementation Measures. Missing from the final plan was the draft's mandate that Sunnyvale monitor housing conditions to determine if changes to its goals are necessitated by the number of households unable to afford the median-priced home or by the increase in the median rent. Finally, the adopted plan lacked the draft's provision declaring that Sunnyvale shall "[s]how good faith in attempting to enter into agreements with the Dallas Housing Authority to provide sufficient subsidized housing to meet regional needs, as described in the policies of this Housing Element."

### e.    Sunnyvale's Current Zoning Ordinance

Sunnyvale's current zoning ordinance was adopted on September 13, 1993 and is intended to implement the goals and policies of the final 1993 Comprehensive Plan.  Freilich and his law firm drafted both the new zoning ordinance and the accompanying zoning regulations.

The 1993 Zoning Ordinance has six residential districts:  Agricultural Residential, Single Family Residential - 1, Single Family Residential - 2, Single Family Residential - 3, Single Family Residential - 4, and Attached Housing.  The ordinance incorporates the densities set out in the Comprehensive Plan with two exceptions.  First, the Comprehensive Plan does not provide for an Agricultural Residential land use district and thus does not recommend a density.[64]  In contrast, the Zoning Ordinance sets a minimum lot size of 3 acres for Agricultural Residential.[65]  Second, the Comprehensive Plan sets the base density of Rural Residential at .4 du/a.  The Zoning Ordinance increases the density to .5 du/a.

The low base densities of development may be increased at the discretion of the town and in certain limited circumstances through the use of incentive, bonus, or cluster option provisions. The cluster option allows a developer who achieves a bonus density of six DUs per acre to concentrate those units, with the balance of land going toward the preservation of open space and

---

[64]Def's Ex. 143.

[65]Def's Ex. 171.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 52**

the creation of buffer and recreational areas. The bonus or incentive densities are not permitted of right and are available only under the Cluster Option.[66] The substantive and procedural requirements to qualify for and to process an application for bonus or incentive densities are complex and allow for subjective decisions on the part of Sunnyvale officials throughout the process.

The density bonus for assisted or subsidized housing is conditioned and limited. A maximum of 10% of the available density bonus is given for assisted or subsidized housing in SF-3 or SF-4 districts. Assisted housing in SF-3 can provide an additional 6% to 8% of a unit per acre, but only if the project size is more than 175 acres. This option would only raise the density from 1 du/ac to 1.06 or 1.08 du/ac.

The maximum increase in SF-4 is from 1.4 to 1.66 du/ac if the project is anticipated to occupy more than 50 acres. The maximum increase for assisted housing in AH zoning is 50% of the available density bonus, from 2.5 units per acre to 4.25 units per acre. Even with the assisted housing bonus density, the maximum AH density can only reach as high as 28% to 35% of the typical garden apartment density of 12 to 15 units per acre.

In order for housing to meet Sunnyvale's fair share or regional needs for assisted and/or subsidized housing, bonus density is available only if Sunnyvale determines that the need has not been met previously. Although Sunnyvale has not calculated its fair share of assisted or subsidized housing, Freilich testified that he has considered agreeing to between 10 and 74 public housing units.[67] Sunnyvale's zoning ordinance does not provide for a density bonus that could fulfill the Comprehensive Plan's Affordable Housing Goal of using density bonuses to encourage development of low and moderate income units in order to meet Sunnyvale's share of the regional responsibility for such housing. Duplexes, patio homes, and townhomes are not a use permitted of right in any land use district. Duplexes, patio homes, and townhomes are allowed

---

[66]Def's Ex. 171.

[67]Trial Trans. Vol III-A at 37.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 53**

only in SF-4 and AH under cluster option procedures.  The zoning ordinance does not even mention the term "Apartments."

Before Freilich began revision on the Comprehensive Plan, 100% of the existing residential zoning was at a density of 1 unit per acre.[68]  Not much changed after Freilich came on board.  If the Freilich Plan designations and the Freilich ordinance densities were combined, then 92.8% of the land would be zoned at the density of 1 unit or less per acre.[69]  Less than 1%, or 0.96%, of the land designated for the Attached Housing (AH) residential would be zoned at a density greater than 2 units per acre.  Moreover, the 6.23% of the land zoned at a density of 1.4 units per acre, the SF-4 (MDR) zoned land, was located where sewer service was unavailable.

The 1986 Comprehensive Plan included 65 acres for apartment use.[70]  The Freilich Comprehensive Plan included no acres for apartment use.[71]  Neither the Freilich Comprehensive Plan nor the 1993 zoning ordinance referred to or contained the word "apartments" or "apartment." The terms were deliberately erased from the provisions of the Comprehensive Plan. Sunnyvale's 1987 zoning ordinance had a Duplex "D" district in which duplexes were permitted as a matter of right at two units per acre density.[72]  In contrast, duplexes are not a use of right in any of the new zoning ordinance districts.[73]

### D.    Hammer-Smith's Tabled Application for Rezoning

Hammer-Smith Construction Co., Inc. ("Hammer-Smith") is a real-estate development company which specializes in the development of affordable housing.  The company was started around 1984 by Reginald Smith, who is African-American and Harold Hammer, who is white.

---

[68]Pl's Ex. 42 at 40.

[69]WPI's Prop. Find. Of Fact and Concl. Of Law at 123.

[70]Pl's Ex. 39 at 6.

[71]Def's Ex. 143.

[72]Def's Ex. 167.

[73]Def's Ex. 171.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 54**

In 1988, Hammer-Smith entered into an option contract with Sunnyvale Properties, Ltd., the owner of the Mayhew Ranch in Sunnyvale, to purchase land which had been part of the unsuccessful, Mayhew planned development application.[74]  Because this land was still zoned for one acre lots, Hammer-Smith had to apply for a zoning change.  In particular, the Hammer-Smith proposal requested a zoning variance to enable construction of 1,368 apartments at an average density of twenty-two DUs per acre, 407 townhouses or duplexes at an average density of eight DUs per acre, and 1,376 single-family residences at an average density of six DUs per acre.[75]

On July 11, 1988, Hammer-Smith filed an application for a zoning change with Robert Ewalt, the Town Manager.  Hammer-Smith's application specifically stated as follows:

> As H.U.D. Section 8 homebuilders, and a minority owned business, it is our intention for the apartments and townhouses proposed to be able to participate in the Dallas Housing Authority's rental voucher program, which has a substantial waiting list, with tenant preferences for the North and Northeast quadrant of the County.  It is our intent for the Single Family housing to be readily affordable for moderate income families.[76]

Hammer, who is white, actually filed the application with the Town.  On July 14, 1988, Hammer-Smith's attorney, Roger Albright, sent a follow-up letter to Robert Ewalt discussing the time-frame for consideration of the zoning application.  The letter, in pertinent part, stated:

> Given the fact that my client only has an option on this property with its inherent time constraints and costs, we wish to proceed with our application for rezoning as expeditiously as possible.  Extended delays for further study or extensive amendments to my client's application are not economically or practically feasible in this case.  Therefore, if you believe the Planning & Zoning Commission or the Council will need any additional information in order to take action on this application, I would appreciate being so advised in order that I may make that information available as soon as possible and thus, eliminate any need to table this matter for further information or study.[77]

As Town Administrator, Robert Ewalt is the person responsible for reviewing zoning applications for completeness.  The only additional information requested by Ewalt was a copy of

---

[74]Pls.' Ex. 168.

[75]Pls.' Ex. 169.

[76]Pls.' Ex. 169.

[77]Pls.' Ex. 170.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 55**

the option contract, which was sent to him on July 22, 1988.[78] Ewalt testified at trial that he considered Hammer-Smith's zoning application to be complete in July of 1988.[79]

On August 15, 1988, the P&Z considered the Hammer-Smith Application.  Smith attended this meeting.  Although the Town initially told Smith that the Hammer-Smith application was complete, it subsequently tabled the application and demanded  that Hammer-Smith pay the Town an estimated $22,800 for further impact studies, even though the land which comprised Hammer-Smith's planned development had already been extensively analyzed by the Town's engineer and other consulting engineers as part of the earlier Mayhew application.  The Committee members claimed that they needed additional information regarding the impact that the proposed development would have on local taxes, the school system, water and sewer systems, the existing population, and traffic in the town.  In addition, the P&Z insisted that Sunnyvale's consultants, rather than Hammer-Smith's, be used to conduct these additional studies, although Hammer-Smith would have to pay their expenses.[80]  Ewalt testified at trial that this procedure was "not necessarily" normal.[81]  The P&Z tabled the Hammer-Smith Application pending receipt of the necessary information and studies requested.

On September 19, 1988, the P&Z once again considered the Hammer-Smith Application and was advised by the applicant that it was unwilling to spend the estimated $22,800 to conduct the studies.  Smith refused to pay for these studies, in part, because the Mayhew Ranch developers had already expended half a million dollars on studies for their earlier planned development proposal and in part because he believed that the Council would not approve his zoning application even after he had expended money on additional studies.  In a letter dated September 21, 1988, Albright informed Sunnyvale that Hammer-Smith viewed the P&Z's refusal

---

[78]Pls.' Ex. 171.

[79]Trial Trans. Vol. II-17.

[80]Pl's Ex. 176.

[81]Trial Trans. Vol. II-18.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 56**

to consider its application as a denial of the application and was "not willing to pay a $22,800 fee to enable the City to study broad issues beyond the scope of this project or to study the specific needs of this project <u>before</u> the zoning is granted."[82]  Albright requested that the Hammer-Smith Application be heard by the Town Council.

On October 10, 1988, Smith and Albright were permitted to address the Town Council regarding the application for a zoning change.  The Town Council maintained its position that it would not consider the application until the $22,800 had been paid for the town's consultants to perform the additional impact studies.  In response to Albright's request that Hammer-Smith's proposal be forwarded to the Town Council for action, one Council member declared:

> Well, I'm not going to vote for anything, I'm not going to approve anything.  I won't vote to turn one shovel of dirt until I know how it's going to affect this city - - in every phase that it's going to affect it. Up front before I ever do it and this city, as far as I'm concerned, is not going to pay for it up front. So you can take it that however you want to take it. If you want to take it as a turn down, you take it the way you want to. Until I see the impacts on this city, I won't vote for it.[83]

Albright urged the Town Council to "vote down" the proposal if it did not think that the Mayhew studies were adequate.[84]  The Council, however, refused to take any action until after the P&Z had voted on the Application, although the existing zoning ordinance gave the Council the authority to act on its own accord.  The Hammer-Smith Application was placed back on the P&Z agenda for October 17, 1988.  Neither Albright nor Smith appeared before the P&Z at that meeting.  Smith testified a trial that during the meetings of the P&Z and the Town Council,  he heard racial comments being made in the back of the room.  Smith also heard statements at the town meetings that reflect an economic bias, which he believed translated into a racial bias.

For a period of time, Smith regularly renewed the option held by Hammer-Smith on the Mayhew Ranch Planned Development property.  Although there is not presently a written option in place, Smith testified at trial that there is a general, verbal agreement that Hammer-Smith

---

[82]Pl's Ex. 177.

[83]Pl's Ex. 179.

[84]Pl's Ex. 179.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 57**

continues to have an option to purchase.[85]  Smith further testified that the surrounding areas of
Sunnyvale, including Mesquite, suggest to him that there is demand for the type of housing that
he wanted to build in Sunnyvale.  He advised the Court that if relief was granted in this action, he
would be in a position to move forward with a project in Sunnyvale.  Smith has not filed a new
zoning application since the Hammer-Smith application was tabled in 1988.  He testified that
after reviewing the new zoning ordinance passed in 1993, he concluded that the zoning density of
six units per acre provided in that ordinance was not viable for multifamily development.[86]
Smith testified that a typical multi-family development in the City of Dallas, and in the suburbs,
would have 18, 20, or 22 units per acre.[87]

## IV.   THE CONCLUSIONS OF LAW

### A. Standing

Defendant Sunnyvale asserts that Plaintiff-Intervenor Hammer-Smith has no standing to
maintain this action because (1) any claim arising out of the tabling of its zoning proposal is
premature, and (2) Hammer-Smith did not convey to Sunnyvale credible information that the
proposal was reasonably likely to result in the provision of lower income housing for minority
households.[88]  Defendant also contends that Plaintiff-Intervenor WPI has no standing to maintain
this action, arguing that it cannot show:  (1) an actual or imminent injury in fact to a legally
protected interest; (2) a sufficient causal connection between any conduct of the Town and some
injury to WPI, and (3) facts that, if true, show that WPI's alleged injury likely would be redressed
by a decision in its favor.[89]

The standing requirement in federal courts is based on both the Constitution's Article III

---

[85]Trial Trans. Vol. I-128.

[86]Trial Trans. Vol. I-129.

[87]Trial Trans. Vol. I-129.

[88]Def.'s First Amend. Post-Trial Prop. Findings of Fact and Conclusions of Law at 197.

[89]Id.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 58**

case or controversy requirement and additional, judicially-imposed, prudential limitations. *See Warth v. Seldin,* 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed.2d 343 (1975). The Constitutional component of the standing doctrine requires a plaintiff to demonstrate: (1) "injury in fact"; (2) a causal connection between this injury and the conduct complained of; and (3) the likelihood that the injury will be "redressed by a favorable decision." *See Bennett v. Spear*, 520 U.S. 154, 117 S. Ct. 1154, 1161, 137 L. Ed.2d 281, 295 (1997); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992); *Cramer v. Skinner*, 931 F.2d 1020, 1024 (5th Cir. 1991). As for the additional, prudential limitations, Congress has the power to abrogate these, and the Supreme Court has held that suits brought under the Fair Housing Act are *not* subject to prudential limitations. *See Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 109, 99 S. Ct. 1601, 1612, 60 L. Ed.2d 66, 82 (1979).

The same inquiry used to assess standing for an individual is used to analyze standing of an organization on its own behalf. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378, 102 S. Ct. 1114, 1120, 71 L. Ed.2d 214, 229 (1982); *Friends of the Earth, Inc. v. Crown Central Petroleum Corp.*, 95 F.3d 358, 360 (5th Cir. 1996). Plaintiff-Intervenor Hammer-Smith has brought this suit on its own behalf and is therefore held to the same three-part, Constitutional standard applied to individual claimants.

However, WPI has brought suit on behalf of its members. To have standing to bring suit to redress its *members'* injuries, an association must establish that (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claim nor the relief requested requires the participation of individual members in the lawsuit. *See United Food & Commercial Workers Union Local 751 v. Brown Group*, 517 U.S. 544, 552-53, 116 S. Ct. 1529, 1534 (1996).

### 1.    Injury in Fact

An injury in fact is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In the housing context, a housing

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 59**

organization must demonstrate that the defendant's allegedly discriminatory conduct "perceptibly impaired [the housing organization's] ability to provide counseling and referral services for low- and moderate-income homeseekers." *Havens*, 455 U.S. at 379.

Defendant Sunnyvale's actions in excluding multifamily housing and affordable single-family housing and imposing one-acre zoning have interfered with WPI's and its members' rights obtained under the *Walker* Consent Decree. *See Walker v. HUD,* 734 F. Supp. 1231, 1247 (N.D. Tex. 1989). Specifically, Sunnyvale's planning and zoning regulations have placed a large geographical section of the suburban section of Dallas County effectively off limits for both multifamily rental housing and affordable single-family rental housing, thereby perceptibly impairing WPI's abilities to provide counseling and referral services.

WPI has placed section 8 families in the adjoining cities of Mesquite and Garland. The fact that none of WPI's members currently live in  Sunnyvale is immaterial because Sunnyvale is in the part of Dallas County that is subject to the *Walker* Consent Decree. Moreover, such an argument is circular when Sunnyvale's zoning ordinance and regulations are to blame for the inability of African-Americans like WPI's clients to penetrate Sunnyvale's housing market.

As indicated by the testimony of both Smith and WPI's executive director, Craig Gardner, a demand for affordable housing exists. Defendant, as reflected by Freilich's testimony at trial, has no knowledge of the waiting list of tenants waiting to be placed in low- and moderate-income housing. Defendant's other expert, Professor Dowell Myers, conceded that if there was no other place where such tenants could find affordable housing, then they would move to Sunnyvale.

Gardner, who is experienced in assisting public housing and section 8 families find housing in predominantly white areas of Dallas and the suburbs of Dallas, has personal knowledge of Sunnyvale's location, shopping centers, employment centers, and other amenities at or near Sunnyvale's borders. He testified that if affordable housing exists in Sunnyvale, he and his organization would refer their clients to Sunnyvale. Therefore, WPI and its members have established an injury in fact.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 60**

Likewise, Hammer-Smith has demonstrated an injury in fact by being denied a zoning change necessary for the Hammer-Smith Development project to proceed. *See Arlington Heights v. Metro Housing Corp.*, 429 U.S. 252, 261-62 (1977) (holding that a developer of a proposed project who is denied a zoning change necessary for the project to proceed has clearly suffered "injury in fact"). Hammer-Smith's proposal was sufficiently specific and detailed so as to exhibit its personal stake in the controversy. Although Hammer-Smith itself had not conducted any impact studies, it was reasonably and justifiably relying on studies already performed by the Mayhew Ranch Planned Development, which sought to develop on the same property that was identified in the Hammer-Smith project.

Moreover, Hammer-Smith had informed Sunnyvale that it was prepared to pay the costs attributable to its project as a condition of the zoning. Thus, Hammer-Smith has also established an injury in fact.

### 2.    Causation

To establish a causal connection between the injury and the conduct complained of, the injury has to be fairly traceable to the challenged action of the defendant. *See Lujan*, 504 U.S. at 560-61. While the injury cannot be the result of an independent action of some third party not before the court, standing exists if the injury is produced by the determinative or coercive effect of a defendant's actions upon the actions of someone else. *See Bennett v. Spear*, 117 S Ct. 1156, 1164 (1997). In order to be fairly traceable, the defendant's actions must contribute to the injury, but they do not have to be the sole cause of the injury. *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 558 (5th Cir. 1996).

The discriminatory exclusion of African American families from the Town of Sunnyvale is fairly traceable to Sunnyvale's ban on apartments, consistent one-acre zoning, and negative response to Hammer-Smith's rezoning application. Indeed, as the above Findings of Fact make clear, the discrimination alleged in this suit is directly traceable to the history of planning and zoning in Sunnyvale. WPI and Hammer-Smith have established a causal nexus between their injuries and Defendant's actions.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 61**

### 3.      Redressability

Plaintiffs must show that granting relief in this case will produce "at least a 'substantial probability' that the project will materialize, affording [the plaintiffs] the housing opportunities [they] desire." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 264 (1977); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 139 (5th Cir. 1977).  Contrary to Defendant's argument, enjoining Sunnyvale from implementing its present subdivision ordinances will likely open the doors for developers such as Hammer-Smith to construct affordable low- and middle-income housing that will serve African-American residents such as those who are members and clients of WPI.  A court order enjoining the operation of the existing zoning ordinance and planning practices will not in and of itself cause a single stick of housing of any kind to be built.  Further relief requiring Sunnyvale to adopt a zoning ordinance and use planning practices to remedy the past discrimination as well as to prevent future discrimination will not in and of itself cause a single stick of housing of any kind to be built.  But such relief will remove impediments and barriers that in the past have prevented the building of multifamily and lower cost single-family housing in Sunnyvale.  Once these barriers are removed, it is reasonable to infer that such housing will likely be developed and made available in Sunnyvale. *See Cramer v. Kinner*, 931 F.2d 1020, 1029 (5th Cir. 1991) (holding that the redressability requirement is satisfied by offering sufficient evidence from which to reasonably infer the substantial probability that at least one of plaintiff's alleged injuries would be redressed by a favorable decision).

Such an inference is reasonable based on past proposals for development in Sunnyvale and the availability of funds to make subsidized housing possible.  For example, Sunnyvale has received numerous requests for apartment and other higher density zoning in order to construct apartments and lower cost single-family housing.  These requests include (1) the 1971 proposal for apartments that resulted in the 1971 resolution to ban apartments, (2) the Mayhew Ranch Planned Development proposal, and (3) the Hammer-Smith application for rezoning.  It is not mere speculation that Hammer-Smith will build in Sunnyvale since it still has a verbal option

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 62**

agreement to purchase a portion of the Mayhew Ranch property. Furthermore, funds are available for subsidized housing programs that could provide for low-income housing in Sunnyvale, housing that could be utilized by low-income African-American families. These programs include DHA's public housing and section 8 programs as well as the *Walker* housing trust fund monies for development of units in predominantly white areas of the suburbs. DHA's and WPI's mobility assistance programs also are available to help locate and lease units to African-American families wanting to take advantage of the subsidized housing programs existing in the predominantly white areas of the suburbs. Moreover, apartments in Sunnyvale cannot be far-fetched since several already have been built in the same general area of the County as Sunnyvale. For instance, Cascade Park Apartments, located near Sunnyvale, is a *Walker* housing trust fund recipient. It is clear that it is Sunnyvale's one-acre zoning, not its location, that has kept apartment and high density housing out of the Town.

In conclusion, WPI has standing to bring the instant action, for its members would have standing to do the same. *See Havens Realty Co. v. Coleman*, 455 U.S. 363, 378 (1982) (holding that a housing counseling organization possessed standing when its ability to provide counseling and referral services to its clients had been impaired due to alleged racially discriminatory housing practices); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459 (1958) (declaring that for the purpose of determining the scope of the NAACP's rights as a litigant, the association and "its members are in every practical sense identical"). Moreover, this Court has already held, in its October 31, 1988 Memorandum Opinion and Order denying Sunnyvale's Motion to Dismiss, that Plaintiff Dews had standing to bring the instant suit. Since WPI is merely fulfilling the very same functions performed by Dews before her death, WPI, in a sense, steps into the shoes of Dews and thus has the same standing. Hammer-Smith, too, has standing to remain in this action.

## B.    Statute of Limitations

Defendant attempts to win on the same statute of limitations argument previously raised in its motion for summary judgment and rejected by this Court in its Memorandum Opinion and

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 63**

Order entered May 2, 1989, and it fares no better this second time. As explained in that Opinion, the Supreme Court's opinion in *Havens Realty Corp. v. Coleman* held that a complaint of ongoing violations, when filed under the Fair Housing Act, is timely if filed within 180 days of the last asserted occurrence of an unlawful practice.[90] *See Havens,* 455 U.S. 363, 380-82 (1982). Here, Plaintiffs have alleged and shown ongoing violations beginning as far back as 1953 and continuing to the present day. Their claims of housing discrimination in violation of the Fair Housing Act are therefore timely made.

Plaintiffs' claims under the Civil Rights Acts are subject to the two year limitations period provided under Texas law for personal injury tort actions. *See Wilson v. Garcia,* 471 U.S. 261 (1985); *Drayden v. Needville Indep. Sch. Dist.,* 642 F.2d 129, 131 (5th Cir. 1981); *Price v. Digital Equip. Corp.,* 846 F.2d 1026, 1028 (5th Cir. 1988) (applying two-year limitations period to §1981 action); *Peter Henderson Oil Co. v. City of Port Arthur,* 806 F.2d 1273, 1274-75 (5th Cir. 1987) (applying two-year limitations period to §1983 action); *Drayden,* 642 F.2d at 132 (applying two-year limitations period to §2000d action). As with the Fair Housing Act claims, the two year limitations period begins to run at the end of a continuing violation.

### C.   Liability

#### 1.   Under The Fair Housing Act

The Fair Housing Act expressly prohibits discrimination in the rental or sale of a dwelling on the basis of race, color, religion, sex, familial status, or national origin. *See* 42 U.S.C. §3604(a). The Act has been interpreted to prohibit municipalities from using their zoning powers in a discriminatory manner, that is in a manner which excludes housing for a group of people on the basis of one of the enumerated classifications. *See Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926 (2d Cir.), *aff'd* 488 U.S. 15 (1988)("Without endorsing the precise analysis of the Court of Appeals, we are satisfied on this record that disparate impact was

---

[90]The 1988 Amendments to the Fair Housing Act, which became effective March 12, 1989, added a two-year statute of limitations period. *See* 42 U.S.C. §3613(a). However, as in *Havens,* that provision also states that the two year period starts to run "after the occurrence *or the termination* of an alleged discriminatory housing practice."(emphasis added).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 64**

shown, and that the sole justification proffered to rebut the prima facie case was inadequate."); *United States v. City of Black Jack,* 372 F. Supp 319, 327 (E.D. Mo.), *rev'd on other grounds,* 508 F.2d 1179 (8th Cir. 1974), *cert. denied,* 422 U.S. 1042 (1975). The Fifth Circuit has established that plaintiffs suing under the Fair Housing Act may establish liability by showing intentional discrimination *or* by showing that the defendant's acts have a significant discriminatory effect.[91] *See Simms v. First Gibraltar Bank,* 83 F.3d 1546, 1555 (5th Cir. 1996) ("a violation of the FHA may be established not only be proof of discriminatory intent, but also by a showing of significant discriminatory effect"); *Hanson v. Veterans Admin.,* 800 F.2d 1381, 1386 (5th Cir. 1986) ("a violation of section 804 of the Fair Housing Act may be established not only by proof of discriminatory intent, but also by a showing of a significant discriminatory effect."); *United States v. Mitchell,* 580 F.2d 789, 791 (1978) ("[t]he Fair Housing Act prohibits not only direct discrimination but practices with racially discouraging effects").

### a.   Discriminatory Effect

Discriminatory effect under the Fair Housing Act may be proven by showing either (1) "adverse impact on a particular minority group" or (2) "harm to the community generally by the perpetuation of segregation." *Huntington Branch NAACP v. Town of Huntington,* 844 F.2d 926,

---

[91]Indeed, the majority of Circuit courts to have ruled on this issue have recognized Fair Housing Act claims established by a showing of discriminatory effect. *See United States v. Yonkers Bod. Of Educ.,* 837 F.2d 1181, 1217 (2d Cir. 1987), *cert. denied,* 486 U.S. 1055 (1988) ("the consensus is that a plaintiff need prove only discriminatory effect, and need not show that the decision complained of was made with discriminatory intent"); *Huntington* at 934 ([t]he Act's stated purpose to end discrimination requires a discriminatory effect standard"); *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 448 F.2d 1283, 1287-90 (7th Cir. 1977) (holding that Fair Housing Act claim could be established by proof of discriminatory effect, without proof of discriminatory intent); *United States v. Cit of Black Jack,* 508 F.2d 1179, 1184-85 (8th Cir. 1974), *cert. denied,* 422 U.S. 1042 (1975) ("[t]he burden of proof in Title VIII cases is governed by the concept of the 'prima facie case.' ... To establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect."); *Resident Advisory Board v. Rizzo,* 564 F.2d 126, 146-48 (3d Cir. 1977), *cert. denied,* 435 U.S. 908 (1978) ("[w]e conclude that, in Title VIII cases, by analogy to Title VII cases, unrebutted proof of discriminatory effect alone may justify a federal equitable response").

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 65**

937 (2nd Cir.), *aff'd,* 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed.2d 180 (1988); *see also, Summerchase Ltd. Partnership I v. City of Gonzales,* 970 F. Supp. 522, 527-28 (M.D.La. 1997). The Second Circuit's decision in *Huntington* is directly on point and has been accepted as the leading opinion on Fair Housing Act challenges to zoning ordinances.[92] *See* 1 RODNEY A. SMOLLA, FEDERAL CIVIL RIGHTS ACTS §3.07[4] (3rd ed. 1997) ("In *Huntington Branch, NAACP v. Town of Huntington,* the Second Circuit, in an opinion later affirmed *per curiam* by the Supreme Court, issued the most important zoning practice decision to date under the Fair Housing Act.").

In *Huntington*, the Town of Huntington had enacted a zoning ordinance which restricted private construction of multi-family housing to a narrow urban renewal area and had also refused a non-profit developer's request to rezone a parcel of land located outside the urban renewal area, on which they wished to develop an integrated, multi-family, subsidized apartment complex. The Town argued that the ordinance was designed to encourage private developers to build in the deteriorated, urban renewal area. Plaintiffs challenged both the zoning ordinance itself and the Town's refusal to rezone the particular parcel of land. *See Huntington,* 844 F.2d at 938 (2nd Cir.).

The Second Circuit found that the Town's zoning ordinance had both a "segregative effect" and an adverse impact on African Americans. *See Huntington* at 937-38. In concluding that the zoning ordinance tended to perpetuate segregation, the Court pointed out that "Huntington's zoning ordinance, which restricts private construction of multi-family housing to the largely minority urban renewal area, impedes integration by restricting low-income housing needed by minorities to an area already 52% minority." *Id.* In its adverse impact analysis, the Court relied on the following figures contained in Huntington's Housing Assistance Plan[93] for

---

[92]The Second Circuit's disparate impact test is based on both the Seventh Circuit's four-part test in *Arlington Heights II* and the Third Circuit's test in *Rizzo. See Huntington* at 935-36.

[93]The Town's Housing Assistance Plan (HAP) was adopted by the Town Board and filed with the U.S. Department of Housing and Urban Development (HUD) as part of the Town's application for federal community development funds.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 66**

1982-1985:

> 7% of all Huntington families needed subsidized housing, while 24 % of the black families needed such housing. ... Similarly, a disproportionately high percentage (60%) of families holding Section 8 certificates from the Housing Authority to supplement their rents are minorities, and an equally disproportionate percentage (61%) of those on the waiting list for such certificates are minorities.

*Huntington* at 938; *see also, United States v. Mitchell,* 580 F.2d 789, 791 (5th Cir. 1978) ("[t]he fact that a large majority of Mitchell's black tenants were clustered in a defined area is highly probative of a §3604(a) violation.  Statistics, although not dispositive, 'have critical, if not decisive significance.' ... The district court's decision, based on statistical evidence and evidence of actions that effectively confined blacks to a section of the complex, is therefore consistent with the requirements of §3604(a).") (internal citations omitted).

Once the plaintiff has made out a prima facie case of discriminatory effect, by demonstrating adverse impact on a particular minority group and harm to the community generally by the perpetuation of segregation, the burden shifts to the defendant to prove a compelling government interest.  Specifically, a defendant must show that (1) its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest, and (2) no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact.  *See Huntington* at 939 (relying on *Rizzo* at 149).  In *Huntington*, the Town argued that limiting multi-family development to the urban renewal area would encourage private developers to build in this area and thereby help to revitalize it.  However, the Second Circuit found that less discriminatory methods, such as tax benefits, could be used to encourage private development in the area and that these more direct incentives were more likely to be effective.  *See Huntington* at 939.  In defending its decision not to rezone the particular piece of land outside the urban renewal area, the Town listed seven justifications; the Court found these justifications to be "weak and inadequate." *Id.* at 940.

Finally, in balancing the Plaintiff's showing of discriminatory effect against the Town's asserted justifications, the Court noted that the scale should be tipped in the plaintiff's favor when it is seeking to enjoin interference with its own development plans rather than to compel

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 67**

the municipality to build the housing itself. *See id.* at 940 (citing to the Seventh Circuit's decision in *Arlington Heights II*).

### (1)   Adverse Impact on African Americans

In conducting its disparate impact analysis, this Court, following the example of the Second Circuit in *Huntington*, will look at proportional statistics rather than absolute numbers. *See Huntington*, 844 F.2d at 938 (analogizing to the Supreme Court's use of proportional statistics rather than absolute numbers in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971)).

Sunnyvale's ban on apartments places a disproportionate harm on African-Americans in two ways. First, apartments are disproportionately used by African-American households in Dallas County as compared to white households. According to the American Housing Survey (AHS) for the Dallas Metropolitan Area in 1989, 14.24% of total occupied housing units were occupied by black people and 77.01% were occupied by "white & other" people.[94] However, the 1990 Census data for Dallas County revealed that 24% of renter occupied units in Dallas County were occupied by blacks and 65% of these renter occupied units were occupied by whites.[95]

Second, the ban eliminates much of the housing that can be utilized for subsidized housing programs – including public housing and Section 8 assisted housing – all of which are disproportionately occupied by African-Americans. The *Huntington* court focused on the impact from restricting *subsidized* apartments, rather than the impact caused by restricting apartments in general. The first statistics relied upon were that 28% of minorities and 11% of whites were eligible for subsidized housing, as measured by the percent of the population with incomes below 200% of the poverty line. *See Huntington*, 844 F.2d at 938. The *Huntington* court determined that this 17-point percentage difference between the white and the minority populations was sufficient to show disparate impact. *See id.*

To determine the statistics of the population in need of subsidized housing, the

---

[94]Pl.'s Ex. 130.

[95]Pl.'s Ex. 72.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 68**

*Huntington* court relied on the Huntington Housing Assistance Plan ("HAP"). HUD has replaced the HAP with the Comprehensive Housing Affordability Strategy ("CHAS"). The CHAS does not determine households in need of subsidized housing directly but, instead, measures households with various housing problems as determinative of housing assistance need. Sunnyvale has no HAP or CHAS. There is no County-wide CHAS; the Dallas County CHAS that contains Sunnyvale does not include most of the remaining portion of the County. However, the City of Dallas has prepared a CHAS that is helpful in calculating housing assistance need.

In 1991, the City of Dallas, using data from the American Housing Survey (AHS), examined the city's housing assistance needs and found that 45.72% of black households were very low income to moderate income with housing problems.[96] Only 22.86% of white households in the City fell in the same category, and 31.4% of all households could be described this way. These differences in housing assistance needs are comparable to the disparities found significant in *Huntington*, where 7% of all households needed housing assistance in contrast to 24% of black households. *See Huntington*, 844 F.2d at 938.

As in *Huntington*, minorities in Dallas County constitute a far greater percentage of those individuals currently occupying subsidized rental projects, as compared to their percentage in the County's population. AHS data for Dallas County shows that African-American households constituted 38.39% of the total households in assisted housing in 1985 and 52% of those households in 1989.[97] The racial composition of Dallas County, by contrast, was 60.4% white, 19.8% black, and 13% Hispanic, by population, and it was 68.4% white, 17.8% black, and 11.2% Hispanic, by households.[98] Therefore, African-American households in Dallas County made up from 200% to 260% more of the population in assisted housing than in the general population. Clearly, there is a noticeable disproportion between the percentage of African-Americans

---

[96]Pl's Ex. 4.

[97]Pl's Ex's 123, 129.

[98]Pl's Ex. 72.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 69**

needing housing assistance and the percentage of African-Americans living in the County.

Sunnyvale's one-acre zoning also produces racially discriminatory effects by increasing the cost of housing in the Town. By raising the cost of entry into Sunnyvale, the Town has imposed a barrier that cannot be overcome except by a token number of black households. According to the 1989 American Housing Survey (AHS), only 1,100 black households in the Dallas Metropolitan area paid $150,000 or more for their owner-occupied homes. Yet, thirty-eight times as many whites, or 38,500 white households, paid within the same price range for their homes. While 1,900 black households live in homes valued at $150,000 or more, forty times as many white households, or 82,300 households, live in homes similarly valued.[99]

The racial composition of residents able to afford $150,000 plus homes is consistent with the racial composition of Sunnyvale. The population paying a home purchase price of $150,000 or more is comprised of 2.78% black and 95.71% non-Hispanic white. The population with homes valued at $150,000 or more is made up of 2.16% black and 93.63% non-Hispanic white.[100] The AHS data is consistent with the 1990 U.S. Census data. According to the 1990 U.S. Census, the population of the Dallas County households in homes valued at $150,000 or more constitutes of 1,060 blacks, or 2.17%, and 45,976 whites, or 94.11%. The population in homes less than $150,000 consists of 41,429 blacks, or 15.08%, and 202,453 whites, or 73.72%.[101] Because of the higher cost of homes resulting from large lot, low density zoning, it is no surprise that a disproportionate number of African-Americans have been unable to penetrate Sunnyvale's housing market.

Finally, Sunnyvale's effective denial of Hammer-Smith's request for rezoning had an adverse impact on African-Americans because the planned development was for section 8 housing and multi-family housing, and these types of housing are disproportionately used by

---

[99]Pl's Ex. 129.

[100]Pl's Ex. 129.

[101]Pl's Ex. 233.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 70**

African-Americans, as already explained.  Just as the Town's ban on apartments and insistence on one acre zoning has an adverse impact on black households, the Town's refusal to consider Hammer-Smith's applications likewise had an adverse racial impact.

### (2)    Perpetuation of Racial Segregation

Sunnyvale's ban on apartments and stubborn insistence on large lot, low density zoning also perpetuate racial segregation in Dallas County.  The statistics speak for themselves. The 1990 U.S. Census reported that the population of the Town of Sunnyvale was 2,228 people, including 2,094 whites of non-Hispanic origin, 16 blacks, 20 Asians, and 82 Hispanics.  Thus, Sunnyvale's population was 93.99% white and 0.72% black.[102]  The 1990 Census of Population and Housing also reported that of the 740 occupied housing units in Sunnyvale, including owner occupied and renter occupied units, 718 were white while 7 were black.  Thus, the percentage breakdown of Sunnyvale's households was 97% white and 0.95% black.[103]

Racial segregation can also be seen by a comparison of the population in the areas of Garland and Mesquite immediately adjoining Sunnyvale. These areas are zoned for multifamily and smaller single-family lot sizes.[104]  Not surprisingly, several HUD-assisted apartment complexes exist in Mesquite and Garland, near Sunnyvale.  For instance, Jackson Manor, a HUD-assisted complex in Mesquite, is approximately 4,000 feet from the Sunnyvale town line.[105] In addition, Cascade Parks Apartments is a Walker Housing Supply Fund apartment located near the Sunnyvale border.  WPI provides mobility services to Section 8 and public housing residents living at Cascade Park Apartments.  Mesquite and Garland have the largest numbers of DHA's African-American section 8 tenants of all the Dallas County suburbs.[106]  Mesquite and Garland

---

[102]Pl's Ex. 70.

[103]Pl's Ex. 71.

[104]Pl's Ex's. 116-119, 121

[105]Pl.'s Ex's. 116, 120, 123.

[106]Pl's Ex. 17.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 71**

both operate their own section 8 programs in addition to providing housing for DHA's section 8 tenants residing in their respective cities.[107]

The fact that Sunnyvale's low-density zoning perpetuates racial segregation is further demonstrated by examining census tract 181.04, which includes almost all of the population and occupied housing units in Sunnyvale, as well as a portion of Mesquite. The total occupied units for tract 181.04 are 3.74% black and 5.1% Hispanic. The occupied units for the portion of the tract in Sunnyvale are 0.96% black and 0.55% Hispanic. The occupied units for the portion of tract 181.04 in Mesquite are 8.26% black and 12.5% Hispanic.[108] A comparison with the population in the Garland census tract (181.15) that is next to Sunnyvale shows the same pattern. The total population for that tract is 7.45% black and 6.64% Hispanic. In census tract 181.15, the block groups that are adjacent to Sunnyvale are 4.41%, 9.46%, and 11.32% black.[109]

There is no question that Sunnyvale's planning and zoning practices as well as its preclusion of private construction of multifamily and less costly single-family housing perpetuate segregation in a town that is 97 percent white. Instead of sharing its obligation to provide fair housing, Sunnyvale, by hiding behind its exclusive zoning practices, is compelling neighboring communities to assume its obligation.

### (3)    No Legitimate, Bona Fide Governmental Interest

The Plaintiffs having made out a prima facie case of discriminatory effect by demonstrating both adverse impact on a particular minority group and harm to the community generally by the perpetuation of segregation, the burden now shifts to Sunnyvale to show that (1) its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest, and (2) no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact. *See Huntington* at 939 (relying on *Rizzo* at 149).

---

[107]Pl's Ex's 18, 25.

[108]Pl's Ex. 90.

[109]Pl's Ex's 114, 107-108.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 72**

### (a)    Public Health - Septic Tanks

Sunnyvale contends that its one-unit-per-acre zoning was originally instituted solely for the purpose of protecting the public health from problems with septic tanks. The Town represents that the original justification for the one-acre zoning was a crisis situation caused by homes located on 1/2 acre lots using septic tank systems. However, the evidence at trial revealed that while the City Engineer recommended a one acre minimum for certain lots, due to septic system issues, he did not recommend one acre zoning across the board. At a town council meeting in December of 1971, City Engineer Howard recommended a one acre minimum for residential lots served by septic tanks within 2,000 feet of the lake and for homes of 3,000 square feet or more. While there were some problems with septic tank systems, this governmental interest does not justify one acre zoning of more than the specific lots described by the Engineer. Furthermore, as appropriate sewer facilities became available, the justification for even the limited use of one-acre zoning ceased to be bona fide or legitimate.

### (b)    Regional Obligations

Sunnyvale also argues that its zoning policies requiring large lots and single-family dwellings are justified by its regional obligations regarding environmental protection, agricultural protection, transportation, and air quality. This argument is pretextual and has been fabricated for use as a defense in this lawsuit.

First, the evidence at trial showed that the existing zoning fails to advance the public interests allegedly imposed by these regional obligations, and that Sunnyvale repeatedly ignored the advice of its planners, advice which *would* have advanced these public interests. Second, Sunnyvale has produced no evidence that these regional, public concerns require the exclusion of apartments and high-density single-family homes.

Alternative 3 in the 1993 comprehensive planning Analysis of Alternatives report was the alternative that, according to Freilich, best satisfied the objectives of the Dallas County Open Space Plan as well as other environmental and rural public concerns. Alternative 3 provided for a wide variety of mixed residential uses, including apartments and other high-density residential

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 73**

uses, east of the Major Landscape Frame.  The preferred alternative, the plan adopted by the Town, and the new zoning ordinance place all of the land east of the Major Landscape Plan in residential zoning at densities of 1 du/ac, .8 du/ac, and .5 du/ac.  These residential densities do not protect agricultural or open space land.  And, as explained by Freilich in his presentations to the Town, the protection of agricultural or open space is not incompatible with the presence of apartments and high-density single family housing.

In addition, Joseph Pobiner, the Town Planner in 1986, testified that one-acre zoning would not preserve open spaces but, rather, would result in a large scale version of a tract development.  Pobiner expressed the opinion that it was not "realistic" planning to assign one dwelling unit per acre to the entire low density single family residential classification.  No sound planning principles support Sunnyvale's assigning one unit to the acre for all of its residential areas.  One-acre zoning preserves only the open spaces in larger front and back yards.  Good planning to preserve public open space utilizes increased densities that are grouped, or "clustered," to leave such open space between groups of houses.  Apartments are not inconsistent with public open space planning.

The Court concludes that Sunnyvale has not produced a single legitimate, bona fide governmental interest that would justify their discriminatory zoning and planning practices.

### (4)   Less Discriminatory Alternatives to Existing Zoning

Even if Sunnyvale had stated a legitimate justification for maintaining one acre zoning and banning apartments, the evidence shows that less discriminatory alternatives to these zoning and planning policies exist.  There have been three major city planning efforts in Sunnyvale since 1965.  Each time, the Town planner recommended various zoning schemes as being better suited to Sunnyvale's legitimate interests and objectives than the blanket one-unit-per-acre zoning used by the Town then and now.  Each planner provided for the use of apartments and high-density housing in his best alternatives.

The most highly developed and most thoroughly analyzed alternative was Alternative 3 devised by Freilich during the 1993 planning effort.  The analysis of that alternative clearly

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 74**

established that large lot zoning, .5 to 1 unit per acre, does not serve the Town's legitimate zoning, planning, development, and fiscal interests.  As an alternative to the present and past zoning, Alternative 3 fulfills Sunnyvale's legitimate interests more efficiently than the historical and present zoning.  Alternative 3 achieves this match of interests and methods while including a wide mix of housing types and densities, including apartments, town homes, and small lot single-family homes.  Alternative 3 is also consistent with the presence of publicly assisted housing. Alternative 3 is certainly a less discriminatory alternative that satisfies Sunnyvale's legitimate interests in a cost efficient manner.

The Court concludes that Plaintiffs have established liability under § 3604(a) of the Fair Housing Act by proving that the town's acts had both an adverse impact on African Americans and tended to perpetuate segregation, that Sunnyvale's offered justifications are neither bona fide nor legitimate, and that less discriminatory alternatives to the current zoning ordinance exist.

**b.     Discriminatory Intent**

The  Fifth Circuit's test for finding discriminatory intent in violation of the Fair Housing Act requires plaintiffs to establish (1) a fact issue as to whether the defendant's stated reasons for its decision are pretextual and (2) a reasonable inference that race was a significant factor in the refusal. *See Simms v. First Gibraltar Bank,* 83 F.3d 1546, 1556 (5th Cir.), *cert. denied,* 519 U.S. 1041, 117 S. Ct. 610, 136 L. Ed.2d 535 (1996) (analogizing to the discriminatory intent test for claims brought under the Age Discrimination in Employment Act).  In *Simms,* the evidence at trial established that the plaintiff had submitted a qualified proposal seeking a commitment letter from the defendant bank for the refinancing of an existing loan on property located in a predominantly minority area. *Id.* at 1557.  The Fifth Circuit agreed that the evidence had created a fact issue as to whether the defendant's stated reasons for refusing to issue a commitment letter were what actually motivated the bank.  However, it found that a reasonable jury could *not* find that race was a significant factor in the defendant's refusal. *Id.* at 1557-58.

First, as discussed above, this Court concludes that Sunnyvale's stated reasons for maintaining one-acre zoning, banning apartments, and tabling the Hammer-Smith application,

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 75**

are disingenuous. Second, as explained below with regard to the *Arlington Heights* test, this Court concludes that Plaintiffs have successfully demonstrated *more* than a reasonable inference that race was a significant factor in Sunnyvale's planning decisions over the years.

### 2.    Under the Federal Civil Rights Acts

In contrast to claims brought under the Fair Housing Act, plaintiffs suing under Sections 1981, 1982, 1983 and 2000d must prove discriminatory intent. *See Coleman v. Houston Indep. Sch. Dist.,* 113 F.3d 528, 533 (5th Cir. 1997) (plaintiff must demonstrate intentional discrimination for racial discrimination claims brought under §1983 and §1981); *Hanson,* 800 F.2d at 1386 (5th Cir. 1986) (proof of discriminatory intent required for §1981 and §1982 claims); *Guardians Ass'n v. Civil Serv. Comm'n of New York City,* 463 U.S. 582, 611 (1982) (recovery under § 2000d requires showing of discriminatory intent).  While there has been some confusion over the exact nature of Plaintiffs' Section 1983 claim, the Court will assume that Plaintiffs are alleging racial discrimination in violation of the Constitution's equal protection clause.  In addition, as in the cases cited above, this Court will conduct one discriminatory intent analysis that will cover each of Plaintiffs' separate civil rights claims. *See id.*

The Supreme Court has established a slightly different test for measuring discriminatory intent with regard to zoning decisions in violation of the Equal Protection Clause, than the test used to measure discriminatory intent under the Fair Housing Act. *See Arlington Heights v. Metro. Housing Corp.,* 429 U.S. 252, 97 S. Ct. 555, 50 L. Ed.2d 450 (1977); *see also, United Farm. Of Fla. H. Proj., Inc. v. City of Delray Beach,* 493 F.2d 799, 811 (5th Cir. 1974)("In light of ... the changes in City Planner Smoot's designation for the use of the area without explanation; the conflict between the City's Master Plan designation and the county's long-held and recently reviewed zoning designation for the subject property; ... the desperate need for low income housing for farmworkers; and the concentration of almost all low income housing in a segregated area, we are convinced that the City failed to meet its burden of proving that its refusal was necessary to promote a compelling governmental interest, and thus that the city officials have deprived the farmworkers of equal protection of the law under the fourteenth amendment.").

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 76**

In *Arlington Heights,* a non-profit development corporation brought suit under the Fourteenth Amendment and the Fair Housing Act, based on the Village's denial of its request for rezoning from single-family to multiple-family, in order to build a racially integrated, low and moderate income housing project. *See Arlington Heights v. Metro. Housing Corp.,* 429 U.S. at 254, 50 L. Ed.2d at 457 (1977). While the Supreme Court refused to consider the plaintiff's Fair Housing Act claim, on the grounds that the Seventh Circuit's opinion had not reached this claim, it did establish a multi-factorial test for proving discriminatory intent under the Equal Protection Clause. In the absence of direct evidence of discriminatory purpose, courts may consider the following: (1) discriminatory impact; (2) the historical background of the challenged decision; (3) the specific sequence of events leading up to the decision; (4) any procedural and substantive departures from the norm; and (5) the legislative or administrative history of the decision. *See id.* Once a plaintiff has introduced sufficient evidence to establish discriminatory intent, the burden of proof shifts to the defendant to establish that the same decision would have resulted even had the impermissible purpose not been considered. *See id.* at 270, n. 21.

### (1)    Discriminatory Impact

The first factor to consider is the discriminatory impact of Sunnyvale's one acre zoning, ban on apartments, and tabling of the Hammer-Smith rezoning application. As discussed above, the combined effect of these policies and decisions weighs much more heavily on black households than on white households, both within Sunnyvale and in Dallas County as a whole. Indeed, it is undeniable that Sunnyvale's zoning and regulatory practices have a disparate impact on African-American.

### (2)    Historical Background

In addition, as the Findings of Fact have made abundantly clear, Sunnyvale has a  history of discouraging African-Americans from moving within its borders. As set forth in the Town's 1965 Comprehensive Plan, Sunnyvale was first incorporated in 1953, "to forstall [sic] the community being developed in a substandard manner" and to "discourage premature development." It also proudly announced that the town's relatively high development standards

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 77**

resulted in little growth, but that the growth that occurred was "of exceptionally high quality." The "premature development" feared by the Town was residential development planned for African Americans. In the late 1940's and early 1950's, there was a movement in Dallas County to provide better housing for the County's African Americans. Sunnyvale's incorporation in 1953 and subsequent enactment of one acre zoning in 1965 helped to ensure that few African Americans would move to Sunnyvale.

The 1971 resolution to ban apartments in Sunnyvale was passed in response to an application for a zoning change by a developer wanting to build multifamily housing. One of the questions asked at the Planning and Zoning Committee discussing the proposed development was whether the construction would be low-income housing that would be a liability to the community. A few years later in 1978, the Town Council rejected enactment of an amendment that would have changed the zoning from one-acre to half-acre. While septic tank problems were named as the reason for banning apartments, and for maintaining one acre zoning, the advice given to Sunnyvale was that *certain* large homes or homes close to the Lake needed to be on one acre lots, not that *all* residential development in Sunnyvale should be on one acre lots.

Throughout the 1980s and 1990s, Sunnyvale consistently refused to enter into cooperation agreements with the Dallas Housing Authority despite repeated requests. The Town Council did not enact a resolution to assist in creating affordable housing until 1989, after the present suit had already been filed. When Sunnyvale did enter into a cooperation agreement, it was with Dallas County, which has a client base that is 83% white, as opposed to the Dallas Housing Authority, which has a client base that is 90% African American.

Sunnyvale denied requests from both the Mayhews and Hammer-Smith to develop multifamily housing. Specifically, Sunnyvale demanded Hammer-Smith to conduct many unnecessary impact studies merely because the developer proposed to build multifamily and high density single-family housing and Section 8 housing in particular. The racially motivated comments made by Sunnyvale officials and citizens during meetings discussing the Hammer-Smith proposal further reveal the Town's real reasons for maintaining one-acre zoning.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 78**

Finally, despite the many hours spent holding hearings and drafting background reports and analyses, the 1993 Comprehensive Plan and the enactment of the 1993 zoning ordinance, still embodied the same one-acre zoning that existed in 1965, allotted very little land for high density development, and located the possible high density district in an undesirable area on the fringes of the Town's borders.

### (3)    Specific Sequence of Events

The third factor in the *Arlington Heights* test has already been discussed above with regard to Sunnyvale's history of ignoring the recommendations of its planners and proceeding in the face of sound legal and planning advice.  With regard to the Hammer-Smith debacle, the specific sequence of events leading up to that event are detailed below as departures from normal procedure.

### (4)    Departures from the normal procedure

The Hammer-Smith rezoning application process was marked by several departures from normal procedures, as detailed in the findings of fact:  Sunnyvale's retroactive determination that the application was not complete; the Town Council's demand for additional studies that the Town Administrator admitted were not required from other developers and were not standard procedures; and Sunnyvale's insistence that Hammer-Smith pay its town consultants to conduct the studies, when the standard procedure is to permit developers to select their own consultants.

### (5)    Substantive departures from normal

The Town of Sunnyvale has alleged numerous municipal interests that it claims to have been pursuing in its zoning and planning efforts.  Sunnyvale asserts that the zoning measures actually adopted and implemented are justified by those interests.  Yet, the town's planners and other officials have continuously noted that the blanket low density, single-family zoning employed throughout Sunnyvale's history does not serve those interests.  According to the reports and testimony of those officials, Sunnyvale's zoning does not accomplish the stated goals of the town.  But Sunnyvale has obstinately refused to modify its discriminatory zoning.

### (6)    Defendant's Burden

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 79**

Once a prima facie case of discriminatory intent has been established, the burden of proof shifts to the defendant to establish that the same decision would have resulted even had the impermissible purpose not been considered. *See Arlington Heights v. Metro. Housing Corp.,* 429 U.S. 252 at 270, n. 21.

Sunnyvale claims that it banned apartments due to a public health concern over septic systems; enacted one acre zoning out of a desire to maintain its rural character, ensure development of "exceptionally high quality," and meet various regional goals; and denied Hammer-Smith's rezoning application because it needed additional impact studies. The Court has already determined in its disparate impact analysis that these alleged concerns are disingenuous. The Court remains unpersuaded by Defendant's arguments and finds that the Town has used the above-described rationales as a facade in an unsuccessful attempt to shield itself from liability for excluding both African-Americans and affordable housing from Sunnyvale.

The Court concludes that Plaintiffs have established liability under 42 U.S.C. §§ 1981, 1982, and 1983 by proving that Sunnyvale's zoning policies and practices were done with discriminatory intent. Plaintiffs have also established the other statutory requirements; there is no dispute that Sunnyvale is a municipality covered by Section 1983. However, there is dispute over whether Sunnyvale can be sued under Section 2000d, since it may not be a recipient of federal funds. Having found liability under Sections 1981, 1982 and 1983, this Court does not reach the question of whether Sunnyvale is liable under Section 2000d.

## V.    RELIEF GRANTED

The Fair Housing Act expressly authorizes courts to award injunctive relief:

> if the court finds that a discriminatory housing practice has occurred ... the court may ... grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

42 U.S.C. §3613(c)(1). Analogizing to affirmative equitable relief ordered for Title VII violations, courts have looked to traditional principles of equity for guidance. *See Park View*

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 80**

*Heights Corp. v. City of Black Jack,* 605 F.2d 1033 (8ᵗʰ Cir.), *cert. denied,* 445 U.S. 905 (1979)(directing the district court to take affirmative steps in its efforts to bring low-income housing to the City of Black Jack, but also suggesting that the court meet with the parties to ensure that the relief not be more intrusive on governmental functions than is necessary to achieve the goals of the Fair Housing Act); *see also, Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 616 F.2d 1006 (1979)(affirming the district court's approval of a consent decree ordering site-specific relief). In *Huntington,* the Second Circuit directed the district court to order the Town (1) to rezone the Plaintiff's parcel of land and (2) to strike the challenged portion of its zoning ordinance. *See Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 942 (2ⁿᵈ Cir. 1988), *aff'd,* 488 U.S. 15 (1988). In determining the appropriate relief, the Second Circuit pointed to the protracted nature of the litigation and the Town's proven track record of stalling efforts to build low-income housing. *Id.* Certainly the present case is another example of protracted litigation and a consistent history of opposition to the development of affordable housing.

The Fair Housing Act also gives courts discretionary power to award reasonable attorneys' fees and costs to prevailing parties. *See* 42 U.S.C. §3613(c)(2).

The Court concludes that Plaintiffs' request for injunctive relief, attorneys' fees, and costs is appropriate and should be **GRANTED**. Accordingly, it is **ORDERED** that:

(a) the Town of Sunnyvale is ENJOINED from implementing its present zoning and subdivision ordinances, policies and practices;

(b) the Town of Sunnyvale SHALL adopt zoning and subdivision ordinances, as well as practices and policies, that will remedy the effect of Sunnyvale's past exclusionary practices through affirmative action to encourage the development of multifamily and other affordable housing within the boundaries of the Town of Sunnyvale;

(c) the Town of Sunnyvale SHALL take affirmative action to change its reputation as a municipality hostile to the development of multifamily and other affordable housing and its reputation as a municipality hostile to minorities; and

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 81**

(d) Plaintiffs Mary Dews, Hammer-Smith Construction Company and The Walker Project, Inc. are awarded reasonable costs and attorneys' fees in this case, with the amount to be determined by separate order of this Court.

It is so **ORDERED**.


**SIGNED THIS** **3l** **DAY OF** ____Ju·ly____ , 2000.


CHIEF JUDGE JERRY BUCHMEYER
UNITED STATES DISTRICT COURT


**FINDINGS OF FACT AND CONCLUSIONS OF LAW -- PAGE 82**